**J. W. SCARBORO, Jr., and Mrs. Nan C. Scarboro, Appellants,**

v.

**UNIVERSAL C. I. T. CREDIT COR- PORATION, Appellee.**

No. 22273.

United States Court of Appeals
Fifth Circuit.

July 25, 1966.

Eric L. Jones, Dublin, Ga., for appellants.

Cubbedge Snow, Macon, Ga., Martin, Snow, Grant & Napier, Macon, Ga., of counsel, for appellee.

Before JONES, WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge:

The defendants in this case appeal from a summary judgment against them in an action on a contract of "guaranty." Only two questions are raised: (1) Does the contract of "guaranty" fail as a void contract of suretyship under the Georgia Married Woman's Act? (2) Does the evidence raise a genuine fact issue of novation or release by the executors of a subsequent guaranty? We answer no to both these questions and affirm the judgment.

### I.

In January 1961 Mr. and Mrs. J. W. Scarboro, Jr., the defendants, owned one half the capital stock of Dublin Motors, Inc., the Buick automobile dealership in Dublin, Georgia. Mr. Scarboro owned 49 per cent and was the secretary of the corporation; Mrs. (Nan) Scarboro held only one per cent and had no active role in the business. The other half of the Dublin Motors stock was held by Mr. and Mrs. M. Doug Smith. Mr. Smith served as president of the corporation; his wife had no active part in the business.

January 31, 1961, Dublin Motors entered into a Repurchase Plan agreement with the plaintiff Universal C. I. T. Credit Corporation. This form agreement stated the terms by which Dublin Motors would sell its automobile chattel paper to Universal C. I. T. As is common in these arrangements, Universal C. I. T. agreed to make an "initial payment" to Dublin Motors for the unpaid cash balance of the time price (less a "holdback" for certain contracts until they were fully paid). Universal C. I. T. also promised a periodic "reserved payment" based upon, among other things, the commissions rebated for paper sold to it by the dealership.[1]

May 1, 1961, Dublin Motors entered into a form Floor Plan Credit Agreement with Universal C. I. T. for future inventory financing. Again as is common in these "floor plans," Dublin Motors agreed to execute trust receipts and pay nominal interest for automobiles in its possession. It promised to pay forthwith by cash or commercial paper for each car sold. Universal C. I. T. was to retain title to the inventory.[2]

In addition, May 1, the defendants and their co-shareholders, the Smiths, entered into a personal contract of guaranty for all credit Universal C. I. T. would extend to Dublin Motors under the floor plan or any other arrangement. The main clause of the guaranty was as follows:

"Each of us request you to extend credit to, make advances under wholesale floor plan or other arrangements * * * or otherwise continue to do business with, or to renew or to extend any existing obligation of, or to

1. See 2 Gilmore, Security Interests in Personal Property § 27.1 (1965); Hardy, Another View of the Origin of Dealer Participation in Automobile Finance Charges, 30 Ind.L.J. 311 (1955); cf.

Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 3 Cir. 1963, 325 F.2d 2.

2. See note 1, supra.

forbear for any period of time the strict enforcement of any existing obligation of [Dublin Motors], and to induce you so to do * * * and in consideration thereof * * *, each of us as a primary obligor jointly, severally and unconditionally guarantees * * * that [Dublin Motors] will fully, promptly and faithfully perform, pay and discharge all * * * [its] present and future obligations to you * * *; and agrees, without your * * * first having to proceed against [Dublin Motors] or to liquidate paper or any security therefore, and irrespective of any offset or defense available to [Dublin Motors], to pay on demand all sums due and to become due to you from [Dublin Motors] * * *."

The instrument further stated that the guaranty could be terminated only by three days notice sent by registered mail to Universal C. I. T.

Shortly after the execution of these agreements, the defendant J. W. Scarboro discovered that Dublin Motors April 10, 1961 assigned to Universal C. I. T. a conditional sales contract that had been rescinded prior to its transfer to the finance company. Dublin Motors itself was making the monthly installments on the contract, while imposing upon Universal C. I. T. that they were paid by the former customer. Mr. Scarboro at this time asked his co-shareholder Doug Smith to buy him out or find someone else who would purchase his interest. Later Scarboro threatened to tell Universal C. I. T. about the misrepresented sales contract unless Smith found a buyer for his stock.

In July 1961 Smith persuaded a man named Don R. Riley to buy Mr. Scarboro's stock. About July 5 Scarboro received Riley's check for $4,000 in payment for his 49 per cent interest in the dealership. The record does not disclose the negotiations, if any, between Scarboro and Riley for the transfer of this stock. Mrs. Scarboro transferred her one per cent interest in Dublin Motors to Doug Smith for an undisclosed consideration. Neither of the Scarboros had any subsequent connection with the dealership other than their continuing liability on the May 1 guaranty.

August 10, 1961, Doug Smith, Don R. Riley, and another man, L. D. Woods, executed a new guaranty for Universal C. I. T. on a form identical with the guaranty of May 1. The new guaranty did not purport to replace the old one or to release the Scarboros. According to Mr. Scarboro's deposition, the local Universal C. I. T. office manager had promised him in July that the receipt of a guaranty and financial statement from Riley and Woods would release both the Scarboros from their May 1 guaranty. The Universal C. I. T. district manager did not deny this promise, but asserted in his affidavit that neither Smith, Riley, nor Woods had any discussion or agreement with his company as to releasing the Scarboros from the May 1 guaranty. An employee of Dublin Motors promised to secure Woods' signature on the new guaranty and later assured Scarboro that the instrument had been signed and sent to Universal C. I. T. The record on appeal contains no evidence that the Scarboros sent Universal C. I. T. a notice of cancellation of their guaranty as provided in the contract.

In subsequent months, the defalcations of Dublin Motors multiplied and its financial condition worsened. By December 1961 Dublin Motors was insolvent. January 9, 1962 Universal C. I. T. sued Dublin Motors on the outstanding chattel paper and joined all the individual signers of the May 1 and August 10 guaranties as co-defendants.[3] The Scarboros

---

3. Universal C.I.T. later obtained a judgment against Doug Smith and L. D. Woods in the City Court of Macon, Georgia for $15,516.65, the total amount of damages claimed against all the parties. R. 25, 61. See Woods v. Universal C.I.T. Credit Corporation, 1964, 110 Ga.App. 394, 138 S.E.2d 593. Accordingly, the plaintiff stipulated to a dismissal of the federal action against these two parties, as well as against Don R. Riley, who had died since the complaint was filed in this

pleaded novation and release. Mrs. Scarboro entered a separate defense that the guaranty was void against her as a suretyship of a married woman under Georgia law. The Scarboros demanded a jury trial of factual issues. In December 1963 the plaintiff moved for summary judgment as to the novation and release defense. The district court granted the motion on the ground that the alleged contract of novation lacked consideration and that all parties to the new guaranty had not agreed to release the Scarboros from their old obligation.[4] The record does not show a specific ruling by the trial court on Mrs. Scarboro's suretyship defense, although the defendants' brief on appeal assumes that the summary judgment did cover this issue. In any event the Scarboros' appeal raises both the novation and the suretyship questions.

## II.

The defendant Nan Scarboro bases her plea of suretyship on the Georgia statute that prohibits a wife from binding her separate estate by any contract of suretyship or assumption of debts for her husband.[5] She concedes that Georgia courts have repeatedly held that married women are bound by contracts of guaranty. But she insists that the guaranty she executed for Universal C. I. T. was in effect an unenforceable suretyship contract.

We had the identical question before us on similar facts in McCallum v. Griffin, 5 Cir. 1961, 289 F.2d 135. In that case the woman, her husband, and a relative owned all the shares of a carpet manufacturer that obtained a loan from the Small Business Administration. As a condition of the loan, the SBA had required the three shareholders to execute form guaranties that were separate from the principal contract of the corporation. This Court analyzed the Georgia statutes and cases distinguishing guaranty from suretyship and held the wife's obligation valid as a guaranty. The Court noted that the applicable Georgia statute distinguishes a contract of guaranty as one in which consideration flows to the guarantor as well as to the principal.[6] The leading Georgia cases, the Court con-

suit. R. 61. Universal C.I.T. still seeks a judgment against the Scarboros to establish their joint and several liability under the May 1 guaranty.

4. The Scarboros raised the novation question again, along with another defense, in amendments to their answers, but the court reaffirmed its summary judgment on this issue for the plaintiff.

5. Ga.Code Ann. § 53–503 (1961): " * * The wife is a feme sole as to her separate estate, unless controlled by the settlement. Every restriction upon her power in it must be complied with; but while the wife may contract, she may not bind her separate estate by any contract of suretyship nor by any assumption of the debts of her husband, and any sale of her separate estate, made to a creditor of her husband in extinguishment of his debts, shall be absolutely void."

6. Ga.Code Ann. § 103–101 (1955): "*Definition; guaranty distinguished.*—The contract of suretyship is one whereby a person obligates himself to pay the debt of another in consideration of credit or indulgence, or other benefit given to his principal, the principal remaining bound therefor. It differs from a guaranty in this, that the consideration of the latter is a benefit flowing to the guarantor."

The Uniform Commercial Code, effective in Georgia January 1, 1964, and not applicable to the present case, states among its definitions that " 'Surety' includes guarantor." Ga.Code Ann. § 109A–1—201 (40) (1962). The state's official UCC commentary does not discuss what effect the new definition will have on the § 103–101 distinction, but it surely will not lessen the confusion on the issue. See Braucher & Sutherland, Commercial Transactions-Test 463–473 (3d ed. 1964); 2 Corbin, Contracts § 347 and note (1950, Supp.1964).

Georgia commentators have repeatedly suggested legislative revision of the state's guaranty-suretyship distinction. See Kock, Security Transactions, 17 Mercer L.Rev. 225, 235–37 (1965); Kern, Guaranty and Suretyship, Distinction Without a Difference, 24 Ga.B.J. 273 (1961); Green, Distinction Between Guaranty and Suretyship in Georgia—An Effort in Equity

Effort in Futility, 2 Ga.B.J. 25 (1939); cf. Daykin, Guarantor Distinguished from Surety, 1 W.Res.L.Rev. 75 (1949); Radin, Guaranty and Suretyship, 17 Calif.

cluded, supplement this distinction with requirements that a guaranty be both (1) "a separate and distinct contract entered into to induce the creditor to extend credit" and (2) "a separate undertaking from the primary undertaking of the principal debtor to pay the debt." General Finance Corporation of Atlanta, Northeast v. Welborn, 1958, 98 Ga.App. 280, 105 S.E.2d 386, 389. See National Acceptance Co. v. Fulton National Bank of Atlanta, April 5, 1966, Ga.App., 148 S.E.2d 907.

■■ We find that, under the *McCallum* analysis, Mrs. Scarboro's contract in this case constitutes a guaranty. The contract was separate and distinct from the Repurchase Plan and Floor Plan Credit agreements, and it did induce Universal C. I. T. to extend credit to the dealership. The undertaking by the individual shareholders was separate from the primary undertakings, trust receipts, and other chattel paper, by the principal debtor Dublin Motors. Sufficient consideration flowed to Mrs. Scarboro in the form of protection for her investment in the dealership. The inclusion of a condition in the contract that the creditor need not first proceed against the principal will not in itself transform a contract of "guaranty" into one of "suretyship." National Acceptance Co. v. Fulton National Bank of Atlanta; General Finance Corporation of Atlanta, Northeast v. Welborn. We hold that the guaranty in this case qualifies under Georgia law as an enforceable contract for obligations accruing after its execution.[7]

### III.

■ Mr. and Mrs. Scarboro both contend that the August 10 guaranty by Smith, Riley, and Woods along with the statements made by employees of Universal C. I. T., constitute a novation and release of the May 1 guaranty. The district court rejected this defense, holding that the requirements of a novation had not been met. The essential elements of a novation are the same in Georgia as in most states: "(1) [A] previous valid obligation, (2) the agreement of all parties to the * * * [new] contract, (3) the extinguishment of the old contract, * * * [and] (4) the validity of the new one." Miller-Terrell, Inc. v. Strother, 1952, 85 Ga.App. 763, 70 S.E. 2d 160, 162; Savannah Bank & Trust Co. v. Wolff, 1940, 191 Ga. 111, 11 S.E. 2d 766. There is no doubt in this case as to the validity of either the old or the new guaranty. The question is whether all parties to the new guaranty agreed to the extinguishment of the old one. The new guaranty does not itself purport to extinguish the old contract. The district court found that the new guarantors, Woods and Riley, did not have a contemporaneous agreement with Universal C. I. T. to release the defendants from the old guaranty. The promise of

L.Rev. 605 (1929); Restatement, Security § 82 (1941). With no legislative correction forthcoming, the Georgia bar has attempted to overcome the hazy distinction by development of special drafting techniques. See Saunders, Contract: Surety and Guaranty Contracts—Some Problems of Draftsmanship, 1 Ga.State B.J. 522 (1965).

7. The recent National Acceptance Co. v. Fulton National Bank of Atlanta, April 5, 1966, Ga.App., 148 S.E.2d 907, contains language indicating that agreements like the Universal C.I.T. contract may not be a "guaranty" for debts accrued prior to its date of execution. The court said: " * * * [T]he obligor on such a contract becomes a surety and cannot be bound insofar as the contract guarantees payment of the principal's indebtedness existing at the time the obligor executed the contract." 148 S.E.2d at 910. That language could be significant in this case in that one of the obligations on which Universal C.I.T. sues is a contract Dublin Motors transferred April 10, 1961, several weeks before the execution of the May 1 guaranty. The paper transferred April 10 was unique, however, in that Dublin Motors had already rescinded the contract with the named customer. Since Universal C.I.T. did not discover and Dublin Motors did not concede this misrepresentation until several months after execution of the May 1 guaranty, we do not consider the April 10 contract an existing obligation of the principal in applying the prohibitions of Ga.Code Ann. § 53-503.

a Dublin Motors employee to secure the agreement of Riley and Woods does not alone qualify as a release by the new obligors. Similarly, the assent of a Universal C. I. T. employee to the substitution of Riley and Woods cannot serve as a release without authorization by the new guarantors themselves. Since there is insufficient evidence of an express agreement of release by the new guarantors and Universal C. I. T., the defense of novation cannot be sustained.

██ The defendants argue that allegations in their answer regarding the agreement of Riley and Woods raise a question of fact and preclude summary judgment. We disagree. Rule 56(e) of the Federal Rules of Civil Procedure[8] now clearly provides that on a motion for summary judgment, an adverse party may not rest upon the mere allegations of his pleading; he must by affidavits or other evidentiary matter set forth specific facts showing that there is a genuine issue for trial. See Erickson v. United States, 5 Cir. 1965, 340 F.2d 512. We conclude that the evidentiary material submitted by the defendants does not contradict the assertion in the plaintiff's affidavit that the agreement of Riley and Woods to a release was not obtained. As the Advisory Committee Note to the 1963 amendment of Rule 56 (e) states, "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."[9]

The trial judge correctly held that no genuine issue of fact exists that would necessitate a trial in this case.

The judgment is affirmed.

8. Rule 56. Summary Judgment \* \* \*
(e) *Form of Affidavits; Further Testimony; Defense Required* \* \* \* When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing* that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. As amended Jan. 21, 1963, eff. July 1, 1963.

9. This Court followed the policy of piercing the pleadings on summary judgment prior to the 1963 amendment of Rule 56(e). See Cunningham v. Securities Investment Co. of St. Louis, 5 Cir. 1960, 278 F.2d 600; Kaplan, Amendments of the Federal Rules of Civil Procedure, 1961–1963 (II), 77 Harv.L.Rev. 801, 825–828 & n. 256 (1964); Barron & Holtzoff, Federal Practice and Procedure § 1235.1 & n. 22.7 (Wright ed. 1958, Supp.1965).