Margaret L. RATNER, William M. Kunstler, and Leroy A. Mercer, Plaintiffs,

v.

Warren H. YOUNG, Individually and as Judge of the United States District Court for the Virgin Islands, and Jerome Dreyer, Individually and as Managing Editor of the St. Croix Avis published by Brodhurst Printery, Inc., and Brodhurst Printery, Inc., d/b/a the St. Croix Avis, Defendants.

Civ. No. 437/1973.

District Court, Virgin Islands, D. St. Croix.

Jan. 12, 1979.

388

Frank Padilla, Frederiksted, St. Croix, V. I., for plaintiffs.

James & Resnick, Christiansted, St. Croix, V. I., for defendants.

## OPINION

BREWSTER, District Judge, Sitting by Designation.

This action for damages for libel is an aftermath of the famous Fountain Valley murder trial in the United States District Court of the Virgin Islands, Division of St. Croix.[1] Shortly after the return of the verdicts of guilty and the sentencing of all five defendants, THE ST. CROIX AVIS published an article containing a letter which had been received during the trial by the presiding judge, Warren H. Young, from a state court judge in Baltimore, Maryland, complimenting him on the manner in which he had conducted the proceedings in the murder case. William M. Kunstler, Mrs. Margaret Ratner, Leroy A. Mercer and Mario De Chabert,[2] four defense counsel in the murder case, then brought this suit against Jerome Dwyer, Managing Editor of THE ST. CROIX AVIS, and Brodhurst Printery, Inc., the publisher of the paper, and Judge Young, alleging that the letter was libelous and that they were entitled to $4,000,000.00 damages from such defendants by reason of the publication of it.[3] The author of the letter has not been sued.

The matter is now before the Court on two motions for summary judgment, one filed by Judge Young, and the other, by the rest of the defendants.[4] The motions are substantially the same. A full hearing has been held on them after due notice, with the respective attorneys for each of the parties present and participating. After considering all matters legally relevant to such motions, the Court has concluded that there is no genuine issue as to any material fact concerning a dispositive issue in the case, and that each of the defendants is entitled to judgment as a matter of law.

1. The cases are reported in *Government of the Virgin Islands v. Gereau et al.,* 3 Cir., 502 F.2d 914 (1974), cert. den., 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839, and *Government of the Virgin Islands v. Gereau et al.,* 3 Cir., 523 F.2d 140 (1975).

2. Mercer and De Chabert were citizens and residents of the Virgin Islands, and Ratner and Kunstler, of New York. Before answers were filed in the suit, De Chabert moved that he be dismissed as a party plaintiff. The motion was granted before the hearing on the present motions. Two other defense counsel who lived on St. Croix did not join in this suit.

3. The defendant, Warren H. Young, is sued "individually and as Judge of the United States District Court for the Virgin Islands" and the defendant, Jerome Dwyer, "individually and as Managing Editor of the St. Croix Avis." The recovery sought is for money damages, attorneys fees and costs. The representative capacities in which these defendants are cast are not suable entities. These defendants will be treated as if they were sued only in their individual capacities.

4. Rule 12(b)(6) motions to dismiss were also filed. If they survived later filings of motions, they are treated as motions for summary judgment, unless it is otherwise indicated.

■ The nature of this case makes it necessary to outline the sources from which the facts set out herein are taken, before any narrative or summary of the facts is given. Rules 56(c) and 56(e), F.R.Civ.P., provide that the facts supporting or opposing a motion for summary judgment may be taken from the pleadings,[5] depositions, answers to interrogatories, admissions on file, affidavits and properly authenticated exhibits referred to therein. Wright and Miller, *Federal Practice and Procedure*, Vol. 10, Sec. 2721, at p. 472, citing *Yong Hong Keung v. Dulles*, D.C.Mass., 127 F.Supp. 252 (1954), opinion by Aldrich, J., later Circuit Judge, First Circuit, says that the provisions of Rules 56(c) and 56(e) are enlarging rather than restricting as to the sources of facts on a summary judgment hearing, and that the courts have recognized "great flexibility with regard to the evidence that may be used on a Rule 56 proceeding." The text goes on to say: "The particular forms of evidence mentioned in the rule are not the exclusive means of presenting evidence on a Rule 56 motion. The Court may consider any material that would be admissible or usable at trial." Sec. 2721 at p. 473. Many of the approved sources not listed in Rules 56(c) and 56(e), including some of those used in this opinion, appear in Sec. 2724, at p. 496, et seq.

■ The facts set out in this opinion are taken from the following sources: the pleadings, the answers to interrogatories, the filed affidavits and exhibits referred to therein,[6] the admissions of the plaintiffs,[7] and the matters of which the Court may take judicial knowledge.[8]

There are two rules that relate to the nature of consideration to be given the facts supporting the motions that are applicable here, either because the non-movants failed to file anything in opposition to the motions, or because they failed to file a motion to strike, or to object to, any of the factual matters offered in support of the motions.

■ The plaintiffs' attorney made an oral argument on the hearing of the motions for summary judgment; but plaintiffs filed no brief or other written opposition. The only instrument on file which could possibly be construed as a contradiction of the motions for summary judgment is the plaintiffs' unverified complaint. A party's unsworn pleadings will not suffice to contest the factual matters offered in support of the motion. Rule 56(e), F.R.Civ.P.; *Trip-*

5. While Rule 56 says that the pleadings in the case may be considered in a summary judgment proceeding, the extent to which they may be so considered is dependent upon whether they are verified. A party's sworn pleading is the equivalent of an affidavit in such a proceeding. *Fowler v. Southwestern Bell Telephone & Telegraph Co.*, 5 Cir., 343 · F.2d 150 (1965); *Khan v. Garanzini*, 6 Cir., 411 F.2d 210 (1969); *Runnels v. Rosendale*, 9 Cir., 499 F.2d 733 (1974). On the other hand, if a pleading is unverified, its primary purpose is to show the nature of the cause of action, or defense, as the case may be, and the opposing party can take advantage of any admissions in it. A non-movant cannot rely upon his own unverified pleading to contradict factual matters properly before the court in support of the motion. Rule 56(e) F.R.Civ.P.

6. Relevant affidavits already on file before the motions for summary judgment may be considered on the Rule 56 hearing. *Chan Wing Cheung v. Hamilton,* 1 Cir., 298 F.2d 459 (1962); *McCullough Tool Co. v. Well Surveys, Inc.*, 10 Cir., 395 F.2d 230 (1968), cert. den. 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261; *Munoz*

*International Alliance, etc. v. Well Surveys, Inc.*, 5 Cir., 563 F.2d 205, 214 (1977).

7. Wright and Miller, 10 *Federal Practice and Procedure*, Sec. 2722, at p. 482, says that it is clear that the "admissions on file" mentioned in Rule 56(c) need not be formal admissions pursuant to Rule 36, F.R.Civ.P. The text goes on to say that the admissions "may have emerged at the pretrial conference, have occurred during the oral argument on the motion, have been made in connection with the other discovery procedures, or have their roots in a joint statement or stipulation by counsel."

*Gold Fuel Service, Inc. v. Esso Standard Oil Co.*, 3 Cir., 306 F.2d 61, 63 (1962), and *United States v. Dooley*, 5 Cir., 424 F.2d 1067 (1970), hold that oral admissions of counsel made during the hearing of a motion for summary judgment are properly considered in deciding the motion.

8. *Meredith v. Van Oosterhout*, 8 Cir., 286 F.2d 216 (1960); *Kirk v. Home Indemnity Co.*, 7th Cir., 431 F.2d 554, at 557–558; *Kern v. Tri-State Ins. Co.*, 8 Cir., 386 F.2d 754, 755 (1968).

*oli Company v. Wella Corporation,* 3 Cir., 425 F.2d 932, 935 (1970); *Piper v. United States,* 5 Cir., 392 F.2d 462, 464 (1968); *Dressler v. Sandpiper,* 2 Cir., 331 F.2d 130 (1964). The effect of the failure of the non-moving parties to controvert the facts supporting the motion is that such facts are deemed to be admitted. *Morrison v. Walker,* 9 Cir., 404 F.2d 1046 (1968); *Preveden v. Croatian Fraternal Union of America,* W.D.P., 120 F.Supp. 33 (1954); *Apollo Distributing Co. v. Apollo Imports, Inc.,* S.D. N.Y., 341 F.Supp. 455 (1972). An oral argument does not meet the requirements of the rule. Rule 56(e) provides that the non-movant's response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." The rule further says: ". . . If he does not so respond, summary judgment, if appropriate, shall be entered against him."

█ The plaintiffs also failed to file a motion to strike any of the affidavits or the exhibits offered in support of the motions, or to make any objection to the use of such affidavits and exhibits. As a result, the case falls within what the concurring opinion in *United States v. Dibble,* 9 Cir., 429 F.2d 598, 603 (1970), calls "the well-settled rule that affidavits not in compliance with Rule 56(e) may be considered by the trial court in the absence of an objection by counsel." That concurring opinion further says: "Inadmissible affidavits are no different from inadmissible evidence. They may be stricken in the discretion of the trial judge, but will support a judgment if he elects to consider them and no objection is made." 429 F.2d, at 603. See also: *Mitchell v. Dooley Bros., Inc.,* 1 Cir., 286 F.2d 40, 41–42 (1960); *Klingman v. National Ind. Co.,* 7 Cir., 317 F.2d 850, 854 (1962)[9]; *Unit-*

*ed States v. Western Electric Co.,* 9 Cir., 337 F.2d 568, 575 (1964); *Noblett v. General Electric Credit Corp.,* 10 Cir., 400 F.2d 442, 445 (1968); *Auto Drive-Away Company of Hialeah, Inc., v. I.C.C.,* 5 Cir., 360 F.2d 446, 448 (1966); *Munoz v. International Alliance, etc., supra.*

Sixteen persons, including guests and staff, were in the clubhouse area of the fashionable Fountain Valley Golf Course in St. Croix on the afternoon of September 6, 1972, when a group of masked male intruders, armed with a variety of firearms, swarmed the area and shot at all persons rightfully there. Eight of those people were killed; four others were wounded as they tried to get away; and the remaining four escaped without injury. The coffers of the clubhouse were looted, and some of the victims of the shooting were robbed. The identities of the killers were not known, and there was an intensive manhunt for days. During the course of such manhunt, arrests were made of the five men later charged and tried. All five defendants were blacks. All of the sixteen victims at the club were white, with the exception of the black maid who was working there.

The Court appointed local counsel to defend each of the defendants. Kunstler and Ratner promptly moved in, uninvited, and each one of them took over the defense of one of the defendants, without pay. They began with a press conference called by them when they filed an action for damages against local police and F.B.I. Agents who had been involved in the arrests and investigation on the ground that they had engaged in brutality that violated the civil rights of the defendants. They thereafter attempted to try the issues in the news media as well as the courtroom.[10] Motions to suppress

---

**9.** "The thrust of Rule 56(e) is that the affidavit 'shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' It is settled law that testimony to which no objection is made may be considered by the trier of fact. We conclude that an analogous rule is applicable here. On a motion for summary judgment, if no objection is made to an affidavit, which is objectionable under Rule 56(e), the affidavit may be considered by the court in ruling on the motion. . . ." 317 F.2d, at 854.

**10.** The nature and extent of the publicity are taken from a statement by counsel for the plaintiffs during the course of the hearings on the present motions. It is treated as an admission under the authorities cited in footnote 7.

evidence obtained in searches and confessions made by the defendants followed. The hearings on the motions were bitter and long-drawn-out.

Four efforts were made by Kunstler to disqualify Judge Young, who presided at the trial. The tactics of Kunstler and Ratner were scorched earth all the way, with an apparent attempt not to leave out any of the part of the judiciary involved, if it could be avoided. The record shows numerous, serious outbursts by the defendants wherein they shouted obscenities at the Judge. They were aided and encouraged in many of those outbursts by the shouting of Kunstler and Ratner. The conduct was highly publicized.[11]

The letter of which the plaintiffs now complain was received by Judge Young during the progress of the trial on the merits of the murder case. Mr. Dreyer said he saw it on the occasion of a visit he and another newspaper man had with Judge Young in his chambers. The newspaper men thought it had some news value, but did nothing about it until the trial was concluded. When the verdicts of guilty were returned and the sentences were imposed,[12] Mr. Dreyer called the Judge's office and asked for a Xerox copy of the letter. Judge Young was not in, and Dreyer's message was left with a legal secretary. When it got to Judge Young, he was in the hurried process of getting ready to take an airplane to the States. He made provision for the Xerox copy to be delivered by his bailiff to a reporter Dreyer had designated to get it. There was no conversation with Judge Young about what would be done with the copy of the letter. Mr. Dreyer assumed that Judge Young would not object to the publication of it.

On the following day, when Judge Young was not in the Virgin Islands, the following article, written by the reporter who had received the copy of the letter from Judge Young's bailiff, appeared in an issue of THE ST. CROIX AVIS, under the headline, "Judge Young Commended on Trial Handling".

"Upon completion of the Fountain Valley murder trial, which ended Monday with the conviction and sentencing of the five defendants, Judge Warren H. Young, who presided over the lengthy suppression of evidence hearing and over the trial, released a copy of a letter he had received from Judge Charles D. Harris of the Supreme Bench of Baltimore City, Baltimore, Maryland.

"In the letter dated July 27, Judge Harris commended Judge Young upon his decorum and ability to prevent efforts to turn the murder trial into a 'political trial', and also stated that attorney William Kunstler and the Black Panthers organization had tried to use the same tactics in a trial he had heard in 1971. The text of the letter by Judge Harris is published below:"

"Dear Judge Young:

11. Most of these background facts are based on matters in the records of this Court in the Fountain Valley murder case, including the appellate court opinions on appeal on file in this Court with the mandates, of which this Court can take judicial notice. See cases cited in footnote 8. One of those was the *Kern* case, where summary judgment was entered partially on the basis of judicial notice taken of matters in records of other cases previously filed in the trial court. In approving such action, the Court of Appeals said:

". . . Chief Judge Harper took judicial notice of other proceedings in his court which were instituted by Kern, noting that in 1958 Kern filed a number of suits in state court against more than thirty insurance companies. Of these cases, nineteen were removed to the United States District Court for the Eastern District of Missouri, Eastern Division, and six were before Judge Harper. All six were dismissed without prejudice by Kern's counsel, and the District Court records indicate that a short time thereafter the other cases, including the suit against the present appellee, were dismissed. In considering the issues, Judge Harper properly took judicial notice of other proceedings in his court." 386 F.2d, at 755.

See also: *Granader v. Public Bank*, 6 Cir., 417 F.2d 75, 83 (1969), cert. den. 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686; *Paul v. Dade County, Fla.*, 5 Cir., 419 F.2d 10, 12 (1969), cert. den. 397 U.S. 1065, 90 S.Ct. 1504, 25 L.Ed.2d 686; *Moore v. Estelle*, 5 Cir., 526 F.2d 690, 694 (1976); *Cole v. Kelley*, D.C.Cal., 438 F.Supp. 129, 132–133 (1977).

12. Each of the defendants was sentenced on the same day the verdicts were returned.

"Several relatives of mine who live in Frederiksted have sent me clippings of proceedings in the Fountain Valley murder trial which is now being tried in your court. I want to take this opportunity to compliment you upon your decorum and ability to withstand the studied efforts of the defendants and their counsel to provoke the Court and to make the trial 'a political trial'. I say this because I was involved in a fairly similar situation in January of 1971, when I presided at a jury trial in the Criminal Court of Baltimore.

"The defendant was a member of the Black Panthers, and with several other Black Panthers had murdered a white police officer and had attempted to murder a second white police officer. Kunstler attempted to have the trial postponed so that he could represent the defendant, but I refused to postpone the trial because the defendant had successfully used this same tactic for about six months, all the while claiming that he was being denied a speedy trial.

"The defendant used the same tactics and continued to shout obscenities throughout the trial, often stalking from the court room back to the Court House lockup. On each occasion I merely noted for the record that the defendant had voluntarily absented himself from the court room. The predominantly black jury convicted the defendant of murder in the first degree and attempt to murder the second police officer. Sentences of life imprisonment plus twenty years, to be served consecutively, were imposed by me.

"The verdict and sentences were affirmed by our appellate courts and certiorari was refused by the U.S. Supreme Court. The case is *Conway v. State*, reported in 15 Md.App.Reports 198, decided April 21, 1972.

"After the trial, the local court-appointed attorney for the defendant told me that, prior to the beginning of the trial, out-of-state Black Panther representatives had called on him and had ordered him to do everything possible to make the trial a political trial and to advise the defendant to do everything possible to provoke me and to commit a mistrial.

"It is for this reason that I have a great deal of sympathy for your present position. According to the newspaper clippings which were sent me, Mr. Kunstler and Mrs. Ratner are following the same tactics which the Black Panther organization attempted to do in the case tried by me.

"My best wishes for a successful outcome of a trial which I know must be a continued and tremendous strain upon your patience.

"Sincerely yours,

"Charles D. Harris."

None of the defendants here ever had any conversation with Judge Harris at any time before the filing of this suit.

The principles stated in the two quotations that follow give the object and function of summary judgment, and the test for determining whether it should be granted.

"Summary judgment under Rule 56, Federal Rules of Civil Procedure is properly granted where the record establishes that there is no genuine issue as to any material fact concerning a dispositive issue in a case and that the moving party is entitled to judgment as a matter of law. . . ." *Pennington v. Pacific Coast Transport Company*, 5 Cir., 419 F.2d 122 (1969). See also: Rule 56(c), F.R.Civ.P.; *Gold Fuel Service, Inc. v. Esso Standard Oil Co.*, 3 Cir., 306 F.2d 61 (1962); *Flumara v. Texaco Inc.*, E.D.Pa., 204 F.Supp. 544 (1962), affirmed, 310 F.2d 737; *Case & Co. Inc. v. Board of Trade of City of Chicago*, 7 Cir., 523 F.2d 355 (1975); *Zweig v. Hearst Corp.*, 9 Cir., 521 F.2d 1129 (1975); *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 479 F.2d 201 (1973); *Golden v. Kentile Floors, Inc.*, 5 Cir., 475 F.2d 288 (1973); *Holm v. Shilensky*, 2 Cir., 388 F.2d 54 (1968); *Norfolk and Western Ry. Co. v. Anderson's Black Rock, Inc.*, 4 Cir., 350 F.2d 917 (1965); *Alt v. American Income Life Ins. Co.*, 10 Cir., 337 F.2d 472 (1964).

■ "The [object] of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is genuine need for trial." *Scarboro v. Universal C.I.T. Credit Corporation*, 5 Cir., 364 F.2d 10, 15 (1966). See also: *Applegate v. Top Associated, Inc.*, 2 Cir., 425 F.2d 92 (1970). One of the chief functions of summary judgment is the "avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. . . . " *Washington Post Co. v. Keough*, 125 U.S. App.D.C. 32, 365 F.2d 965 (1966).[13] The Court's duty on motion for summary judgment is limited to determining whether there is a genuine issue of any material fact concerning a dispositive issue in the case. It has no authority to decide such issues in the hearing on the motion if they do exist. *Gauck v. Meleske*, 5 Cir., 346 F.2d 433 (1965).

The Court is of the opinion that each one of the following contentions by the defendants is valid, and that any one of them would support a summary judgment against the plaintiff or plaintiffs indicated.

### The Alleged Defamatory Statements Were Not Directed at Plaintiff, Leroy A. Mercer

■ The Court is of the opinion that summary judgment should be rendered against the plaintiff, Leroy A. Mercer, because the record shows without dispute that the alleged defamatory statements were not directed at him.

The letter to defendant, Judge Young, quoted in full in the article in THE ST. CROIX AVIS, was written by a state Criminal Court judge in Baltimore. It congratulated Judge Young on the manner in which he handled the Fountain Valley murder trial. The Maryland judge said he was in position to understand the situation that faced Judge Young because he had recently been in a trial where several Black Panthers had murdered a white police officer. He said that Kunstler had attempted to interject himself into the trial at the last minute. The following statement in the closing portion of the letter leaves no question about the fact that it was specifically directed at the conduct of Kunstler and Ratner, and not at local counsel, Leroy A. Mercer:

> "It is for this reason that I have a great deal of sympathy for your present position. According to the newspaper clippings which were sent me, Mr. Kunstler and Mrs. Ratner are following the same tactics which the Black Panther organization attempted to do in the case tried by me."

At the time the alleged defamatory statements were published, there were no provisions in the Virgin Islands Code regarding civil liability for defamation. 1 V.I.C. § 4 states that the rules of common law, as expressed in the restatements of law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the

---

**13.** The opinion in the *Washington Post Co.* case further says:

"In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the Times principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedom as fear of the outcome of the lawsuit itself especially to advo-

cates of unpopular causes. All persons who desire to exercise their right to criticize public officials are not as well equipped financially as the Post to defend against a trial on the merits. Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues, and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is 'hardly less virulent for being privately administered.' *Smith v. People of State of California*, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959)." 365 F.2d, at 968.

**394**

courts of the Virgin Islands in cases to which they apply, in the absence of laws to the contrary.[14]  Restatement-Torts § 564 is applicable here.  It reads:

"§ 564.  Applicability of Defamatory Communication to Plaintiff

"A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer."

*New York Times v. Sullivan,* 376 U.S. 254, 288, 84 S.Ct. 710, 730, 11 L.Ed.2d 686, 711 (1964), treated a problem of this kind as follows:

"We also think the evidence was constitutionally defective in another respect: it was incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' respondent. . . ."

One of the grounds of reversal of a judgment for the plaintiffs was that "the evidence was constitutionally insufficient to support a finding that the statements referred to respondent."  376 U.S., at 292, 84 S.Ct. 710, 732, 11 L.Ed.2d, at 714.

In a later case, *Rosenblatt v. Baer,* 383 U.S. 75, 81, 86 S.Ct. 669, 673, 15 L.Ed.2d 597, 603 (1966), the Supreme Court, in discussing this question said:

". . . There must be evidence showing the attack was read as specifically directed at the plaintiff."

See also: *Brauer v. Globe Newspaper Co.,* 351 Mass. 53, 217 N.E.2d 736.

Mercer was only one of the local lawyers in the case.  The record shows that Kun-

stler and Ratner had complete, active charge of the defense of the case.  Mercer was not active enough for the author of the letter to know that he even existed.  There is nothing before the Court in this summary judgment hearing that would indicate that "the attack was read as specifically directed at the plaintiff" (Mercer), or that a reader of the newspaper would understand it was intended to refer to anyone other than Kunstler and Ratner.

This is one of the grounds upon which a summary judgment will be entered against the plaintiff Mercer.

*Article Is Not Libelous*

■ The defendants are entitled to a summary judgment against *all* the plaintiffs on the ground that the language complained of was not libelous per se, and therefore could not support an action for defamation in the absence of extrinsic matters alleged as an inducement.  The plaintiffs have not made any such allegations and have presented no proof of such matters in connection with the motions for summary judgment.

The plaintiffs' complaint alleges that Judge Young caused the letter he had received from Judge Harris of Baltimore, Maryland, to be published for the purpose of injuring and defaming the plaintiffs, and of bringing them into public disgrace and injuring them in their livelihood.  The portions of the letter which plaintiffs allege damages them are those which accused them of attempting to provoke the Court and to make the trial a political one.[15]

---

14.  "Virgin Islands Code, Title I, Section 4, Application of common law; restatements.

"The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, A.L.I. and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary."

15.  The only portions of the complaint which attempt to identify the alleged defamatory portions of the letter are paragraphs 9 and 10, which read:

"9.  Said article complimented the Defendant Judge Young and falsely and maliciously accused all defense counsel of 'attempting to provoke the Court and to make the trial a political trial'".

"10.  Said article relates the story of *Conway v. State,* 15 Md.App. 198, [289 A.2d 862] in which Judge Harris says the lawyer had been ordered 'to do everything possible to make the trial a political trial and to advise the Defendant to do everything possible to provoke me and to obtain a mistrial.'  He added that 'according to the newspaper clippings which were sent me, Kunstler and Mrs. Ratner are following the same tactics which the Black Panther

The provision of the Restatement of Torts outlining the elements of the cause of action for defamation, in effect at the time of the publication here involved, were:

"§ 558. Elements Stated

"To create liability for defamation there must be:

"(a) a false and defamatory statement concerning another;

"(b) an unprivileged publication to a third party;

"(c) fault amounting at least to negligence on the part of the publisher; and

"(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."

The cases hold that to be actionable, a published statement regarding an attorney's professional conduct must falsely charge him with actual dishonesty, want of integrity or unprofessional conduct. *High v. Supreme Lodge L.O.M.,* 214 Minn. 164, 7 N.W.2d 675 (1943); *Bleecker v. Drury,* 2 Cir., 149 F.2d 770 (1945); *Conley v. Southern Import Sales, Inc.,* D.C.Ala., 382 F.Supp. 121 (1974).

There is nothing about the language complained of, standing alone, that meets their requirements. It is common knowledge that many famous political trials in American and English history have been considered to reflect credit upon the defense attorney who was advocating an unpopular cause. John Adams was defense counsel in the so-called Boston Massacre cases, where several British soldiers were charged with murder of some colonists resulting from their firing shots into a crowd of protesters. The defendants were unpopular, but Adams won an acquittal for them. That his defense of the case did not damage him is shown by his continued success as a lawyer and his subsequent election as President of the United States.

Kunstler himself evidently considered that there was nothing unprofessional about being associated with the defense of a political trial. The uncontested affidavit of John F. James, dated September 13, 1973, filed in support of the motions, says that on more than one occasion Kunstler told him that the Fountain Valley murder case was "a political trial." [16]

■ Whether trial tactics attempting to provoke the court and to obtain a mistrial would be considered unethical or unprofessional conduct would depend on the circumstances. All competent defense lawyers in criminal cases try to get reversible error in the record. It is generally accepted that there is nothing wrong in such efforts as long as they are not corrupt. The newspaper article contains no charge that Kunstler or Ratner did anything corrupt to try to get a mistrial. It does not charge that they actually did anything wrong. It merely congratulates Judge Young on conducting the trial in a manner that brought respect to the court.

If extrinsic circumstances existed to show that the statements complained of were defamatory and therefore actionable, the plaintiffs were required to allege them. The following is quoted from Comment f, under Sec. 562, Restatement of Torts, explaining this allegation, legally called an inducement:

"The office of the inducement is to narrate the extrinsic circumstances which coupled with the language published, affect its construction, and render it actionable, where, standing alone and not thus explained, the language would appear not to concern the plaintiff, or if concerning him, not to affect him injuriously."

This ground alone requires that summary judgment be entered against all the plaintiffs.

---

organization attempted to do in the case tried by me.' "

**16.** After referring to a conversation with Frank Padilla in regard to this case on September 13, 1973, the affidavit says:

"3. That on prior occasions he has spoken to William Kunstler, Plaintiff herein and has been told by said William Kunstler that 'Fountain Valley is a political trial.' "

### Newspaper Article Was Privileged as Fair Comment

■ Summary judgment should be granted against all the plaintiffs on the ground that the newspaper article and the letter quoted therein were privileged as fair comment or criticism.

The basic principles of law applicable to fair comment and criticism in this case are laid down in Restatement, Torts §§ 606 and 610(3). § 606 provides:

"§ 606. GENERAL PRINCIPLE.

"(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,

"(a) is upon

"(i) a true or privileged statement of fact, or

"(ii) upon facts otherwise known or available to the recipient as a member of the public, and

"(b) represents the actual opinion of the critic

and

"(c) is not made solely for the purpose of causing harm to the other.

"(2) Criticism of the private conduct or character of another who is engaged in activities of public concern, in so far as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Subsection (1) and, in addition, is one which a man of reasonable intelligence and judgment might make."

§ 610 says:

"(3) The privilege of criticism stated in § 606 includes criticism of another's participation in public activities."

The following is quoted from Comment f under § 610:

"f. *Participation in public affairs.* One who as a citizen . . . participated in matters of public concern and importance is subject to criticism and comment which is privileged under the rule stated in § 606. So, too, one who by his activities and by written or spoken language attempts to influence public opinion in any way is subject to the free and honest criticism of his efforts by members of the public. Thus, lobbyists and other persons attempting to influence prospective legislation, propagandists seeking public support for their causes, and various persons who participate in civic and state activities, not as office holders or candidates therefor, but merely as private citizens, are subject to the free expression of the opinion of those commentators who honestly but disparagingly pass judgment upon their activities."

Citing Restatement, Torts § 610 as one of the authorities, 50 Am.Jur. summarizes the underlying principle of law applicable to fair comment and privilege as follows:

"It is firmly established that matters of public interest and concern are subjects of fair comment and criticism, not only in newspapers, and in radio and television broadcasts, but by members of the public generally, and such comments and criticisms are not actionable, however severe in their terms, unless they are made maliciously. . . ." (Footnote references omitted).

The undisputed facts on the hearing of the motion for summary judgment meet the requisites of §§ 606 and 610(3).

While the purpose of the article was obviously to commend Judge Young on the manner in which he had conducted the Fountain Valley murder trial,[17] it commented in a general way upon the trial tactics of Kunstler and Ratner in their defense of the case. There was nothing intemperate or malicious in the letter. The impact on the Virgin Islands of the murders involved made the trial a matter of deep public concern in the Islands. Blacks were on trial for wholesale, unprovoked and un-

---

17. As was pointed out in the general factual summary, the headline of the article was: "Judge Young Commended on Trial Handling."

justified murders of whites. The uprising of the blacks in Africa that resulted in driving from some of the countries there most of the whites who somehow managed to survive was fresh on the minds of the people of the world. The result was that tourism in the Islands almost stopped. Large resort hotels closed. People who had immigrated to the Islands left. Foreclosures on realty were at an all time high. Comment on every phase of the trial, and especially on the sensational New York itinerant [18] lawyers, was natural and proper. The letter in question shows that the author's source of information about the trial was a number of newspaper articles sent him from a relative who lived on St. Croix. The letter gave the citation of the *Conway* case, which was the one in which he said he had problems with defense counsel. The opinion in the letter was the actual opinion of the writer. Certainly, the comment or criticism in the letter was not made solely for the purpose of causing harm to Kunstler or Ratner, or any other defense counsel. The requirements of § 606 are therefore met, and the article in question is privileged as fair comment and criticism.

Kunstler and Ratner injected themselves into the murder trial. They were not sought or invited. They travelled from New York to the Virgin Islands and offered their legal services to the defendants in the murder trial free of charge. They attempted to influence public opinion. They called press conferences. They sought support for their cause. As is said in Comment f under § 610, Kunstler and Ratner were "subject to the free and honest criticism of his efforts by members of the public", and "to the free expression of the opinion of those commentators who honestly but disparagingly pass judgment upon their activities."

In his oral argument on the motions, Mr. Padilla, counsel for the plaintiffs, did not seriously argue that the letter was not privileged as fair comment and criticism when it was written by Judge Harris and delivered to Judge Young. Judge Harris, the author of the letter was never sued. Mr. Padilla said that when Judge Young released the letter to the newspaper, the criticism by Judge Harris became criticism by Judge Young and the letter was thereafter non-privileged and libelous.[19]

If the letter was privileged as fair comment and criticism when Judge Harris sent it to Judge Young, facts existed to bring it within the privilege set out in § 606 and in § 610(3).

There is nothing in the record from any source that can be considered by the Court as furnishing any basis for saying that the privilege ever terminated.

This ground alone would support a summary judgment against all the plaintiffs.

### The New York Times Rule

Summary judgment should be entered against Kunstler and Ratner under the *New York Times* rule.

*New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706, 95 A.L.R.2d 1412 (1964), laid down the rule that "prohibits a public official from recovering damages for a defamatory false-

---

**18.** One of the facts set out in an exhibit attached to a verified pleading stated that in newspaper interviews Kunstler had called himself a "travelling" and an "itinerant" lawyer. Since the statement was not controverted, and since it was not objected to, it may be taken as true.

**19.** The following is taken from p. 19 of the transcript of the hearing on the motions:

After Mr. Padilla referred to Judge Young's actions in showing the letter to the defendant Dreyer during the trial and his releasing a Xerox copy of it to Dreyer after the conclusion of the trial, the following took place:

MR. PADILLA:
"Now, when these series of events took place the criticism of Harris became the criticism of Young, and at that point it was not fair criticism.
"THE COURT: I don't quite get your point. You say from the standpoint of Judge Harris it may have been fair criticism and not libelous—
"MR. PADILLA: Privileged.
"THE COURT:—but then when Judge Young makes use of it it becomes non-privileged and libelous?
"MR. PADILLA: Yes, sir."

hood relating to his official conduct unless he [pleas and] proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[20]

*New York Times* is a landmark case among the Supreme Court decisions holding that the First Amendment limits the imposition of liability for damages based on defamation. Its progeny are many. Most of them deal with the types of plaintiffs necessary to allow the defendant to invoke the protection of the actual malice test—whether they are public officials, or "public figures" who are not public officials, or private individuals who are not public figures. Suits by the first two classes mentioned make the *New York Times* privilege applicable, while those by plaintiffs in the third class do not come within the scope of the privilege. Kunstler and Ratner are not public officials. It is necessary to discuss only the pertinent cases dealing with the application of the *New York Times* actual malice test to cases involving public figures.

*Curtis Publishing Co. v. Butts*, and *Associated Press v. Walker*, both decided in the same opinion, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), were the first cases in which the Supreme Court considered the impact of the *New York Times* decision on libel actions by persons who were not public officials, but who were public figures involved in issues in which the public had a justified and important public interest, where different considerations were present.[21] Neither Walker nor Butts was a public officer. Each one of them was a private citizen. Butts' status as a public

figure is set out in footnote 20. Walker had had a long and honorable career in the U. S. Army. He had commanded the troops that enforced the federal court decree ordering desegregation of the Little Rock, Arkansas public schools. After his retirement a short time later, he became very active in publicly opposing federal court forced integration of public schools. As a result he was a man of some political prominence. Each man, Butts and Walker, was held to be a "public figure". The Court said that Butts attained such status by his position alone, "and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy." The *New York Times* rule was held applicable in their cases. Butts' case met the test, while Walker's did not.

Another milestone case on the question of what type of plaintiff is a "public figure" in libel cases is *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In that case, the plaintiff was a reputable attorney who had represented a murder victim's family in a civil action for damages filed after the defendant police officer had been convicted of the murder. A magazine published by Robert Welch, Inc., contained an article which charged that the murder trial of the policeman was part of a Communist conspiracy to discredit the police; and that the attorney was a "Communist-fronter" who had arranged the "frame-up" of the police officer. It implied that the attorney had a criminal record. The attorney filed a diversity action for damages in a federal court in Illinois. The falsity of the charges was so conclusively proved that the only issue submitted to the

**20.** This has generally been referred to as "the *New York Times* rule".

**21.** Butts was Athletic Director at the University of Georgia, and had formerly been head football coach there. He was widely known among people interested in college football. *The Saturday Evening Post*, published by Curtis Publishing Co., accused him of having "fixed" a football game between his school and the University of Alabama.

Walker was admittedly present during at least some of the massive riot at the University of Mississippi, which erupted because of feder-

al efforts to enforce a federal court decree ordering the enrollment of the first Negro at that University. The Associated Press distributed a news dispatch that Walker had made a speech to some of the rioters encouraging them to act, and that he had taken command of, and had led them in a charge against federal marshals present to help effectuate the court decree. The Supreme Court said that he had voluntarily "thrust himself into the vortex" of the controversy. 388 U.S., at 146, 87 S.Ct. 1975.

jury was that of damages. The plaintiff got a verdict for $50,000.00. The district court rendered judgment n. o. v. on the ground that the *New York Times* rule applied and barred liability because there was no proof that the defamatory statements were published with knowledge of their falsity or in reckless disregard of the truth. The plaintiff appealed. When the case reached the Supreme Court, it was reversed and remanded for a new trial upon the ground, among others, that the plaintiff-attorney was not a "public figure" within the First Amendment rule.

*Gertz v. Robert Welch, Inc.* had this to say as to the meaning of the term, "public figure" for the purposes of the First and Fourteenth Amendments in libel actions:

". . . For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

418 U.S., at 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d, at 808.

This language was quoted with approval in a recent milestone case on this subject— *Time, Inc. v. Firestone*, 424 U.S. 448, 453, 96 S.Ct. 958, 47 L.Ed.2d 154, 162 (1976). The following language of the opinion in the *Firestone* case is consistent with a statement in the quotation from the *Gertz* case: ". . . participants in some litigation

may be legitimate 'public figures,' either generally or for the limited purpose of that litigation . . . ." 424 U.S., at 457, 96 S.Ct., at 966, 47 L.Ed.2d, at 165.

The determination of public-figure status is a question of law to be decided by the court. *Rosenblatt v. Baer, supra.*

The cases cited hold that where the person claiming to have been libeled is a public-figure who has thrust himself to the forefront of a particular public controversy in order to influence the resolution of the issues involved, he must plead and prove actual malice, as that term is defined in *New York Times v. Sullivan.*

Kunstler was a public figure generally, and Ratner was one at least for the Fountain Valley murder case.

The affidavits and exhibits before the Court in support of the motions for summary judgment, together with admissions by counsel for the plaintiffs in the course of his argument on the motions, show that Kunstler was one of the leading lawyers in the country devoting his time to the defense of members of minority groups charged with crime.[22] He styled himself "an itinerant lawyer." He defended many of the leaders in the revolt of the 1960's and early 1970's seeking to get rid of the "establishment". He was almost always on the unpopular side of controversial cases. His cases and trial tactics were widely publicized. Mr. Padilla, the attorney who represented the plaintiffs in the hearing on the motions, made the following admissions during his oral argument (Tr. 16):

---

**22.** It could be that some of the exhibits attached to the affidavits might not be considered if an objection, or a motion to strike, them had been made. In the absence of such an objection, the Court has elected to consider them under the rule announced in footnote 9 and in the cases cited on the page where the footnote appears. Likewise, the Court would regard many of the exhibits as hearsay and would consider them only as proof of the fact that the statements were made and not of the truth of them. ". . . Where the mere fact that a statement was made or a conversation was had is independently relevant, regardless

of its truth or falsity, such evidence is admissible as a verbal act. . . ." 29 Am.Jur.2d, p. 555. For instance, the newspaper and magazine articles were admissible to show the extent of publicity of the trial. However, since there was no objection to, or contest of, the statements in such exhibits the Court has considered one or two of them. The Court's judgment would be the same without them. However, the mere fact that evidence is hearsay no longer destroys its admissibility or probative value, since the adoption of the Federal Rules of Evidence.

". . . Kunstler is a controversial figure, I'll admit. He glories in controversy. That's his life style . . .."

When the Court asked him what was the extent of his admission—whether he was a controversial figure on a local scale or a national scale, he stated:

"I would have to say Mr. Kunstler is a controversial figure on a national scale."

Ratner is not shown to be the public figure that Kunstler has been, but the matters that the Court can consider on this hearing show that she was a public figure for the limited purpose of the Fountain Valley murder trial. One of the exhibits before the Court is the transcript of her testimony on the hearing of her motion requesting admission *Pro Hac Vice* for the defense of the charges in the Fountain Valley trial. She testified that Kunstler came to her office and invited her to go with him to St. Croix to offer their legal services free of charge to the defendants in the Fountain Valley trial; that they went to see the defendants without invitation; that their offer of their legal services without pay was accepted.[23] She took a leading part in the trial, even to the point of joining the defendants when they were disrespectfully shouting at the Court.

It has been previously pointed out that Kunstler stated several times that the trial of the Fountain Valley murder case was a political trial. With its racial overtones and devastating effect on the economy of the Islands, it was unquestionably a public controversy of deep concern to all of the people in the Islands, and to those who owned property there but lived elsewhere. The oral admissions made during the argument of plaintiffs' counsel on the motions would be enough to support the statement just made.[24]

Kunstler and Ratner voluntarily thrust themselves into the vortex of the case that had far-reaching and serious effect on many people not connected with it.

Under the circumstances, the *New York Times* rule is applicable to this case, and Kunstler and Ratner have failed to meet its requirements. This is one of the grounds for summary judgment against them.

### Attorneys' Fees

■ The defendants claim that since there is no contest of their proof submitted in support of the request in their motions that attorneys' fees be fixed and allowed them, the Court should proceed to grant the request.

5 V.I.C. § 541 provides:

"§ 541. Costs defined—

"(a) Costs which may be allowed in a civil action include:

\*      \*      \*      \*      \*      \*

"(6) Attorney's fees as provided in subsection (b) of this section.

"(b) The measure and mode of compensation of attorneys shall be left to the agreement, express or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may fix

**23.** Each defendant already had a lawyer practicing in the Islands appointed to represent him when Kunstler and Ratner appeared on the scene. Some of them apparently felt that their services were no longer necessary and withdrew. Ratner had herself appointed so that she could receive funds available under the Criminal Justice Act.

**24.** After stating that the trial was highly publicized nationally and internationally and was a matter of great public interest, Mr. Padilla went on to say:

"I'd like to say one thing more, sir. The reason why this became publicized, or became of interest, was two-fold: number one, our own advertisement came home to roost. We call ourselves the Paradise of the United States, the American Paradise, and when this happened that the suspects were black and the victims were white, so the news media immediately saw a golden opportunity to rape the virgin, which they did.

"THE COURT: Not only here, but all over the United States?

"MR. PADILLA: All over the United States, all over the world. So it was the news media that created this monster; it was the news media that created—or tried to create a racial aspect to this matter, and it was kept alive. That was the sensationalism, not the murder itself. The murder was a mundane trial, as trials go."

by way of indemnity for his attorneys fees in maintaining the action or defense thereto."

Counsel for the plaintiffs made no contest of the authority of the Court to tax attorneys' fees as part of the costs. The following is quoted from his oral argument in the hearing on motions:

"MR. PADILLA: It is true that costs under our jurisdiction does include attorneys' fees. It is also true that it is discretionary . . .."

Ordinarily, as far as the Court could go on this question in a summary judgment proceeding would be, under proper circumstances, to determine whether attorneys' fees should be allowed. If it were concluded that the matter could be determined under summary judgment, then the liability for them would be established in a partial summary judgment and the issue as to the amount of such fees would be severed and determined in an evidentiary hearing. However, we are met again with the proposition that the uncontested and unobjected to affidavits are sufficient to show liability for attorneys' fees and the amount that should be allowed.

*Estien v. Christian*, 3 Cir., 507 F.2d 61 (1975), says that the Court, in fixing the amount of attorneys' fees, may consider the hours spent working on the case, the normal billing rates, the qualifications and competency of the attorneys, and the quality of their work. See also *Smith v. Government of Virgin Islands*, 3 Cir., 361 F.2d 469 (1966): and *Lucerne Investment Co. v. Belvedere*, 3 Cir., 411 F.2d 1205 (1969).

The defendants have filed affidavits covering the matters set forth in the preceding paragraph. Both the plaintiffs' attorneys, Mr. James and Mr. Resnick are reputable and able. Mr. James had been practicing over twenty years, and Mr. Resnick over seven years, when this case was filed. They have done good work in the case. The number of hours they have spent and the normal charges therefor, with no contest or objection from the plaintiffs, show as a matter of law that the defendants should recover, as part of their costs, $2,000.00 for the legal services of Mr. James and $1,600.00 for Mr. Resnick. All of the costs will be taxed against the plaintiffs, jointly and severally. They will include the sum of $3,600.00 for defendants' attorneys' fees.

### Conclusion

A judge always hesitates to enter a summary judgment. He is disposed to lean towards having the evidence fully developed, and then entering judgment. There is no such inclination in this case. There is no possible merit in the claim. The investigation of it would be a tremendous expense to the defendants. They do not live in the United States; but, because of the itinerant nature of the plaintiffs' practice, their investigator would have to travel over a good part of it to get evidence on the issue of damages. Getting proof for the trial to the Islands would also be expensive. If the trial followed the pattern laid down by these plaintiffs, it would be a long, drawn-out, bitter affair. The matters the Court is entitled to consider in connection with the motions for summary judgment indicate that Judge Young is an extremely patient, able judge. Kunstler and Ratner made the trial an ordeal from the time the hearings on the motion to suppress began until after the defendants were convicted and sentenced. The judge has been beleaguered enough. There would be no purpose in withholding the entry of judgment until after an evidentiary trial.

Judgment will be entered in accordance herewith.