William A. DENNY, Plaintiff-Appellant,

v.

Orville R. MERTZ and McGraw-Hill, Inc.,
Defendants-Respondents-Petitioners.

Supreme Court

*No. 80–436. Argued November 3, 1981.—Decided March 30, 1982.*

(Also reported in 318 N.W.2d 141.)

For the respondents-petitioners there was a joint brief by *Don S. Peterson, Mark S. Schmitt* and *Minahan & Peterson, S.C.*, of Milwaukee, for McGraw-Hill, Inc., and oral argument by *Don S. Peterson;* by *L.C. Hammond, Jr., James H. Baxter, III* and *Quarles & Brady* of Milwaukee, for Orville R. Mertz, and oral argument by *Mr. Hammond.*

For the plaintiff-appellant there was a brief by *Denny & Yanisch,* attorneys, of Milwaukee, and *Wayne B. Giampietro* and *De Jong, Poltrock & Giampietro,* of Chicago, Illinois, of counsel, with oral argument by *William A. Denny.*

DAY, J. This is a review of a decision of the court of appeals published at 100 Wis. 2d 332, 302 N.W.2d 503

(Ct. App. 1981), reversing a decision of the circuit court for Waukesha county, Hon. John P. Buckley, Judge. The principal issue in this case is whether plaintiff-appellant, William A. Denny, a dissident stockholder of a publicly held corporation actively seeking ouster of the management of the corporation is a "public figure" for the purpose of maintaining an action for libel. We conclude under the facts of this case that he is not.

The second issue is: What are the constitutional protections afforded McGraw-Hill, Inc., the publisher of *Business Week* magazine, that published the libel. We conclude that, under the holding of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), Mr. Denny must prove that McGraw-Hill was negligent in publishing the libel in order to recover actual damages. "Presumed" or punitive damages may only be awarded upon proof that McGraw-Hill acted with "actual malice."

The third question is: Does the defendant, Orville R. Mertz, as the alleged source of the defamation published by McGraw-Hill, enjoy the same constitutional protections as the media publisher. We conclude he does not.

Other issues raised will be discussed in the balance of this opinion.

This is the second time this dispute has been before this court. In the earlier decision,[1] this court held that Denny's complaint, which alleged that Mertz and McGraw-Hill defamed him in causing to be published a statement that Denny had been "fired" from an earlier job, was sufficient to maintain a cause of action for libel.

The matter is again before us on review.

Summary judgment was granted defendants by the trial court on remand following this court's prior decision. A summary judgment is appropriate if there is no disputed issue of material fact, so that the action

---

[1] *Denny v. Mertz*, 84 Wis. 2d 654, 267 N.W.2d 304 (1978).

may be disposed of as a matter of law.[2] The facts in the case are as follows:

Mr. Denny was employed by Koehring Company (Koehring), a large Milwaukee corporation, as an attorney from 1954 to June, 1969, when he resigned to go into the private practice of law. During all times pertinent to this action Denny and his family owned about 4,400 shares of Koehring stock. Between 1969 and 1974, the price of Koehring stock dropped from forty-five dollars to five dollars per share, and the Denny family's annual dividend on this stock dropped from $8,000 to nothing. Denny claimed that this drop was due to poor management and, in 1974 and 1975, he became involved in a campaign by dissident stockholders to change the Koehring management.

Their efforts focused on ousting Mr. Mertz, chairman of the board and chief executive officer. He had been employed by Koehring in various executive capacities since 1953. In 1974, he became chairman of the board and chief executive officer. He resigned from these positions on December 5, 1975. In furtherance of these efforts, Denny commenced two lawsuits to get access to Koehring records. He requested both the United States Securities and Exchange Commission and the Wisconsin Commissioner of Securities to investigate what he alleged to be improper transactions of stock engaged in by Koehring and misstatements and omissions in materials mailed to Koehring shareholders.

The Koehring shareholder dispute was reported in the financial pages of the Milwaukee newspapers and in *The Wall Street Journal*. Denny was mentioned in some of the Milwaukee articles. He also wrote a letter to *The Wall Street Journal* suggesting that it might be interested in reporting on the Koehring dispute. The letter

---

[2] *Maynard v. Port Publications, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500 (1980).

was never published, nor was Denny mentioned in any *Wall Street Journal* article concerning Koehring.

*Business Week* became interested in the Koehring controversy on December 5, 1975, when a reporter of that magazine, David Santry, read a news release announcing Mertz's resignation in which Mertz stated that relieving Koehring from shareholder controversies was an important reason for his resignation. Mr. Santry thought that the Koehring dispute would interest the general "business community" because, "it's not often that dissident shareholders can (depose) an incumbent manager."

In researching the story, Santry contacted Denny, who provided the reporter with documents from his files and put Santry in touch with other persons involved in the dispute. Santry also contacted Mertz who informed him that Denny was a biased source and that Denny's employment with Koehring had been "terminated."[3]

Santry's article, entitled "Top Management Ferment At Koehring," appeared in the January 19, 1976, issue of *Business Week,* (a McGraw-Hill publication). In the course of chronicling the attempts by dissident stockholders to remove Mertz, the article stated:

"Also about that time, William Denny, general counsel of Koehring until Mertz fired him in 1969, began to question many of Koehring's management decisions."

Following publication of the article, both Denny and Mertz contacted *Business Week,* informing the magazine that Denny had resigned rather than been fired. *Business Week* published a correction in its March 1, 1976, issue, which read:

---

[3] The testimony is conflicting as to the exact language which Mertz used. Mertz testified in a deposition that he told Santry that "[Denny's] services were really terminated." Santry testified that Mertz stated; "[W]e terminated him."

"A Correction

"In 'Top Management ferment at Koehring' (Management, Jan. 19), BUSINESS WEEK reported that in 1969 Orville R. Mertz, then president of Koehring Co., fired William Denny, who was serving as head of the company's legal department. BUSINESS WEEK'S source for that statement has now reconsidered the circumstances surrounding Denny's departure from Koehring, and has concluded that he erred. Denny resigned. He was not fired."

Denny sued Mertz and McGraw-Hill for defamation. McGraw-Hill and Mertz moved to dismiss the action for failure to state a claim. The motion was denied by the trial court. On appeal this court affirmed the trial court.[4] After remand to the trial court and following discovery, Mertz and McGraw-Hill moved for summary judgment. The trial court granted the motion on the ground that Denny was a "public figure" who had to prove actual malice in order to prevail, and that affidavits, depositions and interrogatories submitted by Mertz and McGraw-Hill established a *prima facie* defense to the action which the affidavits submitted by Denny failed to contradict.

The court of appeals reversed the trial court in a decision dated January 15, 1981, which held that Denny was not a public figure, and remanded the case to the

---

[4] The issue in the earlier appeal was whether the statement that Denny was "fired" was non-defamatory as a matter of law. This Court held that the statement could be the basis for a libel action, stating:

"Both the statement that plaintiff was fired and the article as a whole could be understood by reasonable people in a defamatory sense. Reasonable people could conclude that a person's being fired would tend to injure their reputation in the popular sense or to diminish the respect or esteem that people have for him. Whether the article would actually have that effect is a question for the jury. We only hold that this complaint is not legally insufficient to state a claim." *Denny*, 84 Wis. 2d at 662.

trial court for a trial on the merits under Wisconsin libel law. This court granted Mertz's and McGraw-Hill's petition for review.

Generally, a defamatory statement is one that "tends so to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[5] Such statement is actionable without specific proof of actual pecuniary damages.[6] However, truth is an absolute defense.[7] Certain defamatory statements may be privileged, either because of the relationship between the defamer and the defamed or because of the context in which the statement was made.[8]

## I.

The first question is: Was Denny a "public figure."

In *New York Times Co. v. Sullivan,* 376 US 254 (1964), the United States Supreme Court added a constitutional element to the law of defamation. *New York Times* held that a "public official" could only recover damages for a "defamatory statement concerning his official conduct" if he could prove that the statement was made with "actual malice," that is "knowledge that it was false or with reckless disregard of whether it was false or not."[9]

The "constitutional privilege" articulated in the *New York Times* was expanded to cover a wider range of

[5] *Westby v. Madison Newspapers, Inc.,* 81 Wis. 2d 1, 6, 259 N.W.2d 691 (1977), quoting from the Restatement (2d) of *Torts,* p. 140, sec. 559.

[6] *Lawrence v. Jewell Companies, Inc.,* 53 Wis. 2d 656, 660–661, 193 N.W.2d 695 (1972).

[7] *Schaefer v. State Bar,* 77 Wis. 2d 120, 125, 252 N.W.2d 343 (1977).

[8] For a list and discussion of the types of privilege which provide a defense to a defamation action, *see generally,* 3 Restatement (2d) *Torts,* secs. 583–612 (1977).

[9] *New York Times,* 376 U.S. at 279–280.

potential defamation plaintiffs and defendants.[10] In *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967), the United States Supreme Court brought "public figures" as well as "public officials" within the ambit of the *New York Times* privilege. This process reached its peak in *Rosenbloom v. Metromedia, Inc.,* 403 US 29 (1971). Five separate opinions were delivered by the eight justices who took part in *Rosenbloom.* The plurality opinion by Justice Brennan, which was joined by only two other justices, has been treated by this court as the decision of the case.[11] *Rosenbloom* held that the "knowing falsity or reckless disregard of the truth" standard applied to all "communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous."[12]

---

[10] The first amendment defense to a libel action first articulated in *New York Times* has been referred to as a "constitutional privilege" by courts and commentators, *see, e.g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 325 (1974); *Calero v. Del Chemical Corp.,* 68 Wis. 2d 487, 501, 228 N.W.2d 737 (1975); J. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va. L. Rev. 1349, 1375 (1975). "Constitutional privilege" is treated differently than ordinary privilege since privilege must generally be pleaded and proved by the defendant, *see,* Restatement (2d) *Torts,* sec. 10, comment *c,* sec. 613, comment *i,* whereas a plaintiff in a defamation action affected by the "constitutional privilege" must plead and prove facts sufficient to meet the applicable standard. *See,* Restatement (2d) *Torts,* sec. 580 A, comments *e* and *f;* L. Eldredge, *The Law of Defamation,* sec. 53 p. 293 (1978).

United States Supreme Court decisions in this area include: *Garrison v. Louisiana,* 379 U.S. 64 (1964); *Rosenblatt v. Baer,* 383 U.S. 75 (1966); *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967); *Time, Inc. v. Hill,* 385 U.S. 374 (1967); *St. Amant v. Thompson,* 390 U.S. 727 (1968); *Ocala Star Banner Co. v. Damron,* 401 U.S. 295 (1971).

[11] *Polzin v. Helmbrecht,* 54 Wis. 2d 578, 586, 196 N.W.2d 685 (1972). *See e.g., Eaton, supra,* 61 Va. L. Rev. at 1394–1398.

[12] *Rosenbloom,* 403 U.S. at 43–44.

The "matter of public concern" test for application of the constitutional privilege has never been subscribed to by a majority of the United States Supreme Court and the concept was criticized in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346 (1974).[13]

In *Gertz*, the court held that an attorney representing relatives of a youth murdered by a Chicago policeman in civil proceedings against the policeman was not a public figure and therefore need not surmount the *New York Times* privilege in a libel action against a magazine which allegedly defamed him. The court held that the interests of a person in recovering damages for injury to reputation must be balanced against the encouragement of exercise of first amendment rights, and that the *New York Times* standard did not adequately take this reputation interest into account when a private individual was defamed. The court also held that states could set their own standard of liability in these cases if liability without fault was not imposed. 418 U.S. at 347.

The court justified divergent standards for public figures and private individuals on the ground that public figures had greater access to the media and so could more effectively counteract defamations. It also reasoned that public figures had, by seeking prominent roles for themselves, assumed a risk of being libeled, which was not true of private individuals. 418 U.S. at 344.

Two types of public figures were referred to in *Gertz*. The first type is the person who has such a persuasive fame or notoriety that he may be deemed a public figure for all purposes. The second, and more common type, is one who, by being drawn or injecting himself into a public controversy, becomes a public figure for a limited range of issues. A person may become a "public figure for a limited range of issues" by his efforts to engage

---

[13] For a comprehensive discussion of the impact of *Gertz* upon the law of libel and slander, see *Eaton*, 61 Va. L. Rev. 1349.

public attention so as to influence the outcome of a controversy or by "thrusting himself into the vortex of a public issue." 418 U.S. at 351–352.

Subsequent cases have applied *Gertz* in a variety of contexts. These cases have elaborated on the criteria articulated in *Gertz* for determining limited public figure status, the existence of a public controversy, and the voluntary involvement of the defamation plaintiff in efforts to influence the outcome of such controversy. In *Time, Inc. v. Firestone,* 424 U.S. 448 (1976), the socialite wife of a member of a prominent family brought a defamation action because of an erroneous report in *Time* magazine that her husband had obtained a divorce from her on grounds of "extreme cruelty and adultery." The court held that she need not meet the *New York Times* standard to prevail since, despite the public interest in the proceedings and outcome of the divorce case, it did not amount to a "public controversy" within the meaning of *Gertz.*[14]

---

[14] "Dissolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." *Firestone,* 424 U.S. at 454.

Subsequently, in *Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 167–168 (1979), the court commented:

"A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times.*"

*See, also, Hanish v. Westinghouse Broadcasting Company,* 487 F. Supp. 397 (E.D. Pa. 1980) (fact that plaintiff attracted press attention in connection with his fundraising activities for charity cannot be equated with the existence of a public controversy).

In *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287 (D.C. Cir. 1980), the District of Columbia Court of Appeals drew on previous supreme court decisions to establish a test of whether a public controversy exists:

". . . [T]he judge must examine whether persons actually were discussing some specific question . . . If the issue was being de-

The supreme court further delineated the contours of a "public controversy" in *Hutchinson v. Proxmire*, 443 U.S. 111 (1979). Professor Ronald Hutchinson was engaged in scientific research partially funded by federal agencies. United States Senator William Proxmire awarded a "Golden Fleece of the Month Award" to federal agencies funding Hutchinson's research on aggression in animals, citing the funding as an example of wasteful government spending. Hutchinson sued Senator Proxmire for alleged defamatory remarks that he made in connection with announcing the award.

The court found no public controversy antedating announcement of the award. Any controversy arising subsequent to the award could not transform the plaintiff into public figure status.

"To the extent the subject of his published writing became a matter of controversy, it was a consequence of the Golden Fleece Award. Clearly, those charged with defamation cannot, by their own conduct, create their own defense, by making the claimant a public figure." *Hutchinson*, 433 U.S. at 135.[15]

In *Firestone*, 420 U.S. 448, the court determined that the defamation plaintiff had not voluntarily injected

bated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." 627 F.2d at 1297.

*See also, Orr v. Argus-Press Co.*, 586 F.2d 1108 (6th Cir. 1978) (development of shopping mall of interest to community); *Fram v. Yellow Cab Co.*, 380 F. Supp. 1314 (W.D. Pa. 1974) (cab fare controversy of public concern to city residents); *Ratner v. Young*, 465 F. Supp. 386 (V.I. 1979) (murder trial with racial overtones of concern to those who lived on or owned property in vacation islands).

[15] *See also, Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583 (1st Cir. 1980) (public consumer complaints regarding plaintiff's product which post-dated alleged defamatory articles could not transform plaintiff into public figure status).

herself into a public discussion of issues in an effort to influence their resolution:

> "Nor did respondent freely choose to publicize issues as to the propriety of her married life. She was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony."[16]

The court rejected the contention that Mrs. Firestone's contacts with the media converted her into a public figure. She granted press conferences "in an attempt to satisfy inquiring reporters," rather than to thrust herself to the forefront of some public controversy.[17]

---

[16] *Firestone*, 424 U.S. at 454. *See also, Littlefield v. Fort Dodge Messenger*, 614 F.2d 581 (8th Cir. 1980) (a lawyer involuntarily drawn into a forum to protect his interests, was not a public figure); *Dodrill v. Arkansas Democrat Co.*, 590 S.W.2d 840 (Ark. 1980) (activities in complying with requirements for taking bar exam were not voluntary activities within *Gertz* "public figure" test). *Compare, Peisner v. Detroit Free Press, Inc.*, 82 Mich. App. 153, 266 N.W.2d 693 (1978) (attorney appointed to handle criminal appeal was not a public figure), and *Ratner*, 465 F. Supp. 386 (attorney volunteering to represent criminal defendants for no fee was a public figure).

[17] *Firestone*, 424 U.S. at 454–455, n. 3.

Access to the media, although often an accouterment of public figure status and part of the rationale for distinguishing a public figure from the more vulnerable private individual who generally lacks access, is certainly not determinative of public figure status. *See, Wolston*, 443 U.S. at 164. *See also, Reliance Insurance Co. v. Barron's*, 442 F. Supp. 1341, 1348 (S.D. N.Y. 1977) (Insurance company making $50 million public stock offering held a limited public figure for purposes of discussion of the offering, although federal securities law prohibited access to media during the period of registration.)

However, active pursuit of media coverage is an important criterion of voluntary involvement in a public controversy in an effort to affect its resolution. *See, Yiamouyiannis v. Consumers Union*, 619 F.2d 932 (2nd Cir. 1980) (plaintiff became public figure because he actively sought publicity in effort to prevent fluoridation of water supplies); *Orr*, 586 F.2d at 1108 (attorney

In *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157 (1979), the court also considered the nature of voluntary acts sufficient to warrant "public figure" status. In 1958, plaintiff Wolston refused to obey a subpoena to appear before a grand jury investigating Soviet espionage, citing ill-health. He subsequently pled guilty to criminal contempt for his failure to appear. Wolston later brought a defamation action against the publishers of a 1974 book which named Wolston as a Soviet agent.

The court acknowledged that Wolston voluntarily chose not to appear before the grand jury and that publicity regarding his refusal was foreseeable. But, since he had been subpoenaed, he would have been drawn into any public controversy surrounding the grand jury investigation regardless of his actions. Since Wolston had not voluntarily undertaken to involve himself in a public controversy so as to influence its resolution, he was not a public figure required to meet the *New York Times* standard in an action for defamation arising out of a communication pertaining to the Soviet spy allegations.[18]

Analyzing the above cases, we consider the following criteria applicable to whether a defamation plaintiff may be considered a public figure. First, there must be a public controversy. While courts are not well-equipped

sought publicity for shopping mall proposal in connection with which newspaper articles appeared after his indictment for fraud); *Di Leo v. Koltnow*, 613 P.2d 318 (Col. 1980) (former police officer actively sought publicity regarding his efforts to be reinstated).

[18] *Wolston*, 443 U.S. at 167–168. *See also, Schultz v. Reader's Digest Assn.*, 468 F. Supp. 551 (E.D. Mich. 1979) (fame due primarily to passive connection to investigations of alleged connections to underworld figures not voluntary involvement in public controversy); *Lake Havasu Estates, Inc. v. Reader's Digest Assn., Inc.*, 441 F. Supp. 489 (S.D. N.Y. 1977) (plaintiff company did not voluntarily involve itself in land fraud controversy).

to make this determination as pointed out in *Gertz*,[19] the nature, impact, and interest in the controversy to which the communication relates has a bearing on whether a plaintiff is a public figure. Secondly, the court must look at the nature of the plaintiff's involvement in the public controversy to see whether he has voluntarily injected himself into the controversy so as to influence the resolution of the issues involved. Factors relevant to this test are whether the plaintiff's status gives him access to the media so as to rebut the defamation and whether plaintiffs should be deemed to have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Gertz*, 418 U.S. at 344–345.

Applying these standards, we hold that Denny is not a public figure for the purpose of maintaining this action. While newsworthy, the Koehring stockholder disputes did not have an impact outside of those immediately interested in the Koehring corporation. Defendants assert that the Koehring dispute raised the larger issue of corporate governance and thus made it a public controversy. However, the record is clear that Denny's attempts to change Koehring management were motivated by his desire to protect his substantial investment in Koehring stock, rather than to affect the way that corporations are governed.

While Denny did deliberately involve himself in the Koehring dispute in order to influence the management of Koehring, his efforts to protect his investment in Koehring did not give him the media access which would justify designating him a public figure. Furthermore, those actions did not invite the increased risk of publica-

---

[19] *Gertz*, 418 U.S. at 346. *See also, Waldbaum*, 627 F.2d at 1296–1297.

tion of defamatory falsehoods about him. By the time Santry talked to him about the Koehring dispute, Mertz had resigned and the controversy in which Denny was involved had ended. Denny was therefore not attempting to influence a public controversy by his actions relating to the *Business Week* article, and his contacts with Santry relating to the article may not transform him into public figure status. For, as the United States Supreme Court held in *Hutchinson,* a person may not be made into a public figure by the very publication which defames him, 443 U.S. at 135.

## II.

The second issue is: What constitutional protections are afforded the news media (publication or broadcasting) in defamation actions brought by private individuals. *Gertz* stated that while the *New York Times* "knowing or reckless falsehood" standard applied to actions brought by public officials or public figures, each state was free to set its own standards for actions brought by private individuals against the news media, so long as liability without fault was not imposed. *Gertz,* 418 U.S. at 342–343, 347.

The majority of jurisdictions which have responded to the United States Supreme Court's invitation in *Gertz* to set standards for defamation actions brought against the news media by private individuals have held that such plaintiffs must prove that defendants were negligent in order to prevail.[20] Three states have retained

---

[20] *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216, 1222 (1977); *Dodrill,* 590 S.W.2d at 844; *Phillips v. The Evening Star Newspaper,* 424 A.2d 78, 86–87, (D.C. Ct. App. 1980); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 543 P.2d 1356, 1366 (1975); *Troman v. Wood,* 62 Ill. 2d 184, 340 N.E.2d 292, 296–299 (1975); *Gobin v. Globe Publishing Co.,* 216

the *Rosenbloom* standard requiring private individuals to prove knowing or reckless falsehood if the defamation involved a matter of public concern.[21] New York has adopted a gross negligence standard.[22]

The decisions which have imposed a negligence standard have based such decision on a perception that was the standard favored by the *Gertz* opinion,[23] and because a negligence standard was most compatible with the common law of the state and public policy considera-

---

Kan. 223, 531 P.2d 76, 83–84 (1975); *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688, 697–698 (1976); *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161, 168–169 (1975); *Maloney & Sons, Inc. v. E.W. Scripps Co.*, 43 Ohio App. 2d 105, 334 N.E.2d 494, 498 (1974); *Martin v. Griffin Television, Inc.*, 549 P.2d 85, 92 (Okla. 1976); *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 417–418 (Tenn. 1978); *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819–820 (Tx. 1976); *Seegmiller v. K.S.L., Inc.*, 626 P.2d 968 (Utah 1981); *Taskett v. King Broadcasting Co.*, 86 Wash. 2d 439, 546 P.2d 81, 85 (1976).

[21] *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450, 457 (1980); *A.A.F.C.O. Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind. App. 671, 321 N.E.2d 580, 586 (1974); *Peisner*, 266 N.W.2d at 697–698.

[22] *Chapadeau v. Utica Observer Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569 (1975).

[23] *E.g.*, the following language from *Jacron Sales Co.*, 350 A.2d at 696–697:

"While holding that 'so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability,' the *Gertz* Court left little doubt of its assumption that most states would adopt a negligence standard. At one point, the Court stated: 'Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a *reasonably prudent* editor or broadcaster of its defamatory potential . . . .' In prohibiting punitive damages, the Court stated that such 'damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions.' Justice Blackman, concurring, flatly states that 'the Court now conditions a libel action

tions.[24] Justice Schaefer of the Illinois Supreme Court persuasively stated the arguments for a negligence standard in *Troman v. Wood,* 62 Ill. 2d 184, 340 N.E.2d 292, 296–299 (1975).

"The defendant concedes that the Federal Constitution does not require Illinois to apply the *New York Times* standard. Nevertheless the defendant urges that we should now adopt that standard as a matter of State policy. The arguments in support of that position lean heavily on the adverse effect on freedom of the press which would supposedly follow in the absence of the actual malice standard. But the extent to which liability for defamation adversely affects freedom of speech and press is a Federal constitutional question, and it has been authoritatively determined by the Supreme Court that a standard of liability less rigorous than that of actual malice will not impermissibly abridge that freedom. In deciding what standard of liability shall now apply to defamatory publications, our function is not to make an independent reappraisal of the requirements of the first amendment, but rather to ascertain whether there is any basis in Illinois law which would prevent the application here of the general principle that person is responsible for damage that he intentionally or negligently inflicts upon another.

"The adoption of a requirement of actual malice cannot, of course, be justified on the theory that such a requirement furthers some overriding public policy of this State, for prior to *New York Times* it was not considered that liability for defamation required any showing of fault at all, let alone proof of actual malice. . . .

"It is suggested that, in lieu of ordinary negligence, liability should be limited to instances of either gross

by a private person upon a showing of negligence. . . .,' and Chief Justice Burger characterizes the majority opinion as introducing to defamation law the concept of 'negligence,' Justice Brennan refers to a reasonable care standard, and Justice White's dissent contains similar language." (citations omitted).

[24] *See* e.g., *Phillips,* 424 A.2d at 86–90; *Troman,* 340 N.E.2d at 297–299; *Gobin,* 531 P.2d at 83–84; *Martin,* 549 P.2d at 92; *Memphis Publishing Co.,* 569 S.W.2d at 418–419; *Taskett,* 546 P.2d at 84–86.

negligence or willful and wanton misconduct. We do not believe that this limitation is either necessary or appropriate. The law of defamation is already complex and multifaceted, and it would not profit by the introduction of a distinction based upon differing degrees of fault.

"Our adoption of negligence rather than actual malice as a standard is in accord with several decisions in other States which were rendered since *Gertz*. As the court said in *Gobin, supra*, 531 P.2d at 83.

"[P]ersons are generally held accountable for their negligence—the lack of ordinary care either in the doing of an act or in the failure to do something. The whole theory of negligence presupposes some uniform standard of behavior for the protection of others from harm. The norm usually is the conduct of the reasonably careful person under the circumstances."

We agree with the reasoning in the *Troman* case.

Jurisdictions which have retained the *New York Times* standard for actions by private individuals defamed by a media communication involving a matter of public interest have done so out of a belief that a negligence standard would have a "chilling effect on the news media"[25] and because of a perception that their state constitution requires this additional protection of free speech and a free press.[26]

Reviewing Wisconsin law, we conclude that a private individual need only prove that a media defendant was negligent in broadcasting or publishing a defamatory statement. Article I, sec. 3 of the Wisconsin Constitution, which protects freedom of speech, expressly recognizes an action for libel, providing, however, that truth shall be a defense to any criminal action:

"**Free speech; libel.** SECTION 3. Every person may freely speak, write and publish his sentiments on all

---

[25] *Walker*, 538 P.2d at 458; *A.A.F.C.O. Heating*, 321 N.E.2d at 588.

[26] *A.A.F.C.O. Heating*, 321 N.E.2d at 586. *Peisner*, 260 N.W.2d at 697–698.

subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact."

That freedom of speech is subject to some limitations was set forth by this court in *Hotel & R.E.I. Alliance v. Wis. E.R. Board*, 236 Wis. 329, 341, 294 N.W. 632 (1941):

"The right to speak freely is guaranteed by the constitution, but that right, the same as other rights guaranteed by the constitution, is subject to limitations. In the exercise of that right one is not free from liability for libel, duress, or fraud, although speech was the agency in each case."

Furthermore, this court has recognized that freedom of the press is not an absolute, but may be limited to protect the valid reputation interests of members of society. This court, in *State v. Evjue*, 253 Wis. 146, 33 N.W.2d 305 (1948), held that a statute forbidding publication of the identity of a sexual assault victim did not unconstitutionally abridge the freedom of the press, stating:[27]

---

[27] The statute, sec. 348.412, Stats. 1945, read:

"Any person who shall publish or cause to be published in any newspaper, magazine, periodical or circular, except as the same may be necessary in the institution of prosecution of any civil or criminal court proceeding, or in the compilation of the records pertaining thereto, the identity of a female who may have been raped or subjected to any similar criminal assault, shall be punished by imprisonment in the county jail for not more than one year or by fine not exceeding five hundred dollars, or by both such fine and imprisonment."

In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), the United States Supreme Court held that a Georgia statute similar

"As has already been stated, this statute is intended to protect the victim from embarrassment and offensive publicity which no doubt have a strong tendency to affect her future standing in society. . . . .

"When the situation of the victim of the assault and the handicap prosecuting officers labor under in such cases are weighed against the benefit of publishing the identity of the victim in connection with the details of the crime, there can be no doubt that the slight restriction of the freedom of the press prescribed by sec. 348.-412, Stats., is fully justified." *Evjue*, 253 Wis. at 161–162.

We conclude that a negligence standard complies with the guarantee of freedom of the press contained in the Wisconsin Constitution.

The general rule in Wisconsin is that a person has an obligation to exercise reasonable care so as to not cause foreseeable harm to another.[28] Once it has been established that a person has harmed another through his negligence, liability will follow unless the court deter-

---

to sec. 348.412, Stats. 1945, unconstitutionally abridged the freedom of the press. *Cox* reenforces the point that the Wisconsin Constitution does not provide for broader free press rights than does the United States Constitution.

[28] In *A.E. Investment Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 483–484, 214 N.W.2d 764 (1974), this court stated:

"The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act.

"A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone. A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is established, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforeseeable plaintiffs."

*See also, Schilling v. Stockel*, 26 Wis. 2d 525, 532, 133 N.W.2d 335 (1965).

mines that public policy considerations preclude holding the negligent actor liable.[29]

We conclude that the public policy balance favors the application of a negligence standard in defamation actions by private individuals against the news media. While malice is an element of actionable libel in Wisconsin, our court has implied the existence of such malice from the libelous publication itself[30] in holding persons involved in the publication of the libel liable.[31] The limited extent to which the law will protect a defamatory statement, and the reasons underlying the concern for aiding a defamed individual in obtaining redress for damage to reputation were set forth in *Williams v. Hicks Printing Co.*, 159 Wis. 90, 101, 150 N.W. 183 (1914), in which this Court discussed the concept of malice insofar as it related to an action for libel.

"One need not go further on the subject of malice in proving a charge of libel than to prove the publication, unless the situation is such as to fall within the field of conditional privilege, and then malice in law is circumstantially rebutted and malice in fact, or express malice, as it is otherwise called, is required.

"So it is not to be thought that mere good faith, honest belief in the correctness of the publication, or good motives, or accident or inadvertence, is, of itself, a defense, or even sufficient to mitigate as to actual damages, because such faith, belief, and motive are not inconsistent with malice in law arising, as a legal result, from the

[29] "The determination to not impose liability in instances where a negligent act has been committed and the act is a 'substantial factor' in causing the injury rests upon considerations of public policy." *Hartridge v. State Farm Mut. Auto Ins. Co.*, 86 Wis. 2d 1, 11, 271 N.W.2d 598 (1978).

[30] *Polzin*, 54 Wis. 2d at 578–579; *Flynn v. Western Union Tel. Co.*, 199 Wis. 124, 127, 225 N.W. 742 (1929).

[31] *See, Pfister v. The Sentinel Co.*, 108 Wis. 572, 580–583, 84 N.W. 887 (1901); *Smith v. Utley*, 92 Wis. 133, 137–138, 65 N.W. 744 (1896).

perpetration of the act of publishing an article, the natural tendency of which is to make its victim appear ridiculous or contemptible, or a subject of hatred, or to disgrace him in society or injure him in his business."

The common law of defamation in Wisconsin does not require that any degree of culpability greater than negligence be proven in actions for defamation against the media by a "private individual."

A person's reputation and good name is of inestimable value to him and once it has been besmirched by another through carelessness or malice restoration is virtually impossible.[32] Protection of a citizen's good name is a proper concern of the state.

The duty to exercise reasonable care so as not to harm another, which pervades the law of torts, applies to the media and is appropriate in light of the substantial and legally protected interest of private individuals in maintaining their good name.[33] This standard strikes an appropriate balance between that interest and society's interest in free communication of ideas which is protected by the first amendment to the United States Constitution and Article I, sec. 3, of the Wisconsin Constitution.

---

[32] *Compare, Maynard,* 98 Wis.2d at 564–566, which held that in light of *Gertz,* Wisconsin law did not support a libel action against a contract printer unless the printer knew or had reason to know of the alleged libel.

[33] "A good name is to be chosen rather than great riches." Proverbs XXII, 1. (R.S.V.)
"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; tis something or nothing;
'Twas mine, tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him,
And makes me poor indeed." Shakespeare, *Othello,* Act. III, sc. 3, line 155.

Because of our holding that the *Gertz* standards apply to McGraw-Hill, Denny is not entitled to punitive or presumed damages from McGraw-Hill unless he can prove actual malice. Without proof of such malice, Denny can only recover the actual damages which he can show that he suffered due to the *Business Week* article. Such actual damages are not limited to out-of-pocket loss. In *Gertz,* 418 U.S. at 349–350, the United States Supreme Court stated:

"It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury."

Items of damage recoverable in libel and slander actions in Wisconsin are set forth in Wis. J I—Civil 2516 (1974).[34]

### III.

The third question is: Does the defendant Mertz enjoy the same constitutional protection as the media publisher.

We requested the parties to brief this specific question following filing of their original briefs.

[34] The provisions of sec. 895.05, Stats. 1979–1980, pertaining to damages in libel actions, may also affect the actual damage award.

We find no case directly in point on this issue and it appears to be a case of first impression before this court.

The supreme court has not ruled as to whether the standards governing defamation actions set forth in *Gertz* apply to all defendants, or just media defendants. In *Calero,* 68 Wis. 2d at 501–507, this court held that the constitutional restrictions on the common law of defamation set forth in *Gertz* and its predecessors did not apply to a purely private communication between individuals. However, in *Polzin,* 54 Wis. 2d at 586, this court held that critics of the media were entitled to the same level of protection against actions for defamation as was the media, despite the fact that the allegedly libelous statement at issue was contained in a letter from a private individual which was never published. However, that is not an issue in this case.

We view the Mertz communication to Santry as coming within the standards applicable to private defamation actions.

It would be poor public policy to hold that a defendant defaming a private individual to non-media persons has no constitutional protection but if he disseminates his defamation to the media, then it is protected. A defamation that is published or broadcast gets infinitely greater circulation and can do the defamed person much greater harm. That such a defamer can then wrap himself in the constitution and acquire greater protection because he has done more harm is not the law of Wisconsin.

While we recognize that some courts in other jurisdictions have held that the *Gertz* protections apply to all defamations, regardless of whether published through the media or by private persons,[35] we do not read *Gertz*

---

[35] This position is persuasively articulated in *Jacron Sales Co., Inc. v. Findorf,* 350 A.2d 688. *But see, e.g., Harley-Davidson Motorsports, Inc. v. Markley,* 279 Or. 361, 568 P.2d 1359 (1977).

as requiring that the protections provided therein apply to non-media defendants nor, as stated above, do we consider it good public policy to so decide.[36] We reaffirm our holding in *Calero* that purely private defamations are not entitled to constitutional protection for, as stated by Mr. Justice Goldberg in his concurring opinion in *New York Times*, 376 U.S. at 301–02, quoted with approval by this court in *Calero,* 68 Wis. 2d at 505:

"Purely private defamation has little to do with the political ends of a self-governing society. The imposition of liability for private defamation does not abridge the freedom of public speech or any other freedom protected by the First Amendment."

We therefore hold that Mertz's statement to Santry is entitled to no constitutional protection and that his liability for the statement, if any, should be determined according to the common law of defamation in this state.

Mertz raises additional grounds for dismissing him from the action. First, when this case was before this court on defendants' motions to dismiss, this court held that the statement in the *Business Week* article that Denny had been "fired" was actionable. *Denny,* 84 Wis. 2d at 655, 662. Discovery has revealed, however, that

---

The decision in *Jacron* also stated that "truth is no longer an affirmative defense to be established by the defendant, but instead the burden of proving falsity rests upon the plaintiff." 350 A.2d at 698. We strongly disagree with this allocation of the burden of proving the truth of a statement and reaffirm the law of this state that if a defamation defendant relies on the truth of his statement to avoid liability, he must affirmatively prove such truthfulness as a defense, rather than forcing the plaintiff to prove that the statement is false. *See, e.g., Schaefer,* 77 Wis. 2d at 125.

[36] In holding that the *Gertz* protections do not apply to non-media defamation defendants, we decline to follow the suggestion in sec. 580B Restatement (2d) of *Torts,* comment *e,* that the *Gertz* protections are not restricted to the media, but should apply to all defamation defendants.

Mertz used the word "terminated" rather than "fired" in his conversation with Santry.[37]

Mertz argues that his statement that Denny was "terminated" was not defamatory as a matter of law because it could not harm Denny's reputation or lower him in the esteem of the community. He also argues that the statement was substantially true, which is an absolute defense to a libel action. *Schaefer,* 77 Wis. 2d at 123. In support of this, he cites the dictionary definition of "terminate": "To bring to an ending or cessation in time, sequence, or continuity; . . . to end formally and definitely"[38] and two cases from other jurisdictions which held that a statement that an employe was "terminated" was not libelous as a matter of law.[39]

We hold that whether Mertz's statement was defamatory is a matter for the jury. The statement must be interpreted in light of the overall context in which it was made. *Denny,* 84 Wis. 2d at 659. Santry understood Mertz to mean "terminated for cause" or fired. That others at *Business Week* equated "terminated" with "fired" is indicated by the following statement contained in a letter from the editor in chief of *Business Week* to Denny following the publication of the allegedly defamatory article:

"The reporter who worked on the story 'Top Management Ferment at Koehring' in the January 19, 1976 issue of BUSINESS WEEK came away from his interviews with the previous management with the clear impression *that you had been terminated from Koehring, rather than having resigned."* (Emphasis added.)

---

[37] *See* n. 3, *supra.*

[38] *Webster's Third New International Dictionary,* (unab. 1961) at 2359.

[39] *Demmel v. Triumph of Europe, Inc.,* 208 N.Y.S.2d 463 (1960); *Becker v. Toulmin,* 165 Ohio St. 549, 138 N.E.2d 391 (1956).

We accordingly hold that Mertz's statement could have been understood by reasonable people in the community in a defamatory sense, and, insofar as it conveyed the impression that Denny had been fired, was not true.

Mertz also argues that, if he uttered a defamatory statement, it was reasonably necessary to protect his own reputation. He sought to inform Santry that Denny had reason to present a biased account of events and that Santry should appropriately discount Denny's statements in preparing his article. Thus, Mertz maintains, his statement was cloaked in a common law conditional privilege because it was reasonably necessary to protect his own reputation against the damaging version of events likely to be reported in the *Business Week* article. This privilege, which is set forth in Restatement (2d) *Torts,* sec. 594 (1977),[40] was recognized by this court in *Converters Equipment Corp. v. Condes Corp.,* 80 Wis. 2d 257, 264, 258 N.W.2d 712 (1977). However, even though a communication is privileged, a person may be held liable for a defamation contained therein if he abuses the privilege.

In *Ranous v. Hughes,* 30 Wis. 2d 452, 468, 141 N.W.2d 251 (1966), this court adopted the Restatement definition of what constitutes an abuse of a conditional privilege.

"The Restatement further lists the four conditions which may constitute an abuse of the privilege, and the occurrence of any one causes its loss. These are: (1)

[40] "594. **Protection of the Publishers Interest.** An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that:

"(a) there is information that affects a sufficiently important interest of the publisher, and

"(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

The defendant either did not believe in the truth of the defamatory matter or, if believing the defamatory matter to be true had no reasonable grounds for so believing; (2) because the defamatory matter was published for some purpose other than that for which the particular privilege is given; (3) because the publication was made to some person not reasonably believed to be necessary for the accomplishment of the particular privilege; or (4) because the publication included defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the privilege is given."

This case is before us on a summary judgment motion. We cannot say from a review of the record that Mertz did not abuse the privilege in making the statement concerning Denny to Santry. We therefore leave the resolution of this issue to the trial of the case.

In conclusion, we affirm the court of appeals and overturn the summary judgment on the ground that there exists a dispute over the material facts as to whether McGraw-Hill was negligent in allowing the publication of the untrue statement that Denny had been "fired," whether Mertz in fact defamed Denny by statements he made to Santry, whether those statements were privileged and, if so, was the privilege abused. We remand this case for a trial on the merits.

*By the Court.*—The decision of the court of appeals is affirmed and the case is remanded to the circuit court for proceedings not inconsistent with this opinion.

COFFEY, J., took no part.

HEFFERNAN, J. (*concurring*). Under the facts of this case I agree with the majority's conclusion that Denny was a private person and, accordingly, is not required to prove malice in order to prevail against the media defendant.

I would, however, apply the same standard—that of *New York Times* and its progeny—in suits against either a media or nonmedia defendant. Accordingly, I join in the reasoning of Justice Abrahamson's dissent in that respect.

Hence, Denny as a private person need not, in my judgment, prove malice in respect to his defamation suit against Mertz. I therefore agree with the mandate of the majority.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). This case involves the accommodation of two societal interests: The protection of the constitutional right of free speech and free press and the protection of persons from injuries to reputation.

I dissent because I conclude that by adopting a too narrow interpretation of the concept of public figure while applying the negligence standard to defamation suits by private persons against media defendants the majority does not provide adequate "breathing space" for freedom of the press and for freedom of speech. I also dissent because the majority, without adequate justification, gives non-media defendants less protection in the exercise of their constitutional right of free speech than it gives media defendants in the exercise of their constitutional right of free press.

*Nature of the Plaintiff—Public Figure; Private Person.* While Denny holds no public office and is not a person of such notoriety that he is a public figure for all purposes, I conclude, using the test set forth by the majority, that he is a public figure for the limited purpose of the Koehring controversy. The United States Supreme Court has not set forth a clear, easy to understand or easy to apply statement of the attributes of a public figure. The majority reads *Gertz* as establishing a two-step test for determining public figure status:

does a public controversy exist; has the defendant voluntarily thrust himself or herself into the controversy. Further, the majority correctly acknowledges that *Gertz* [1] and subsequent cases [2] frown on courts determining

[1] The United States Supreme Court said in *Gertz*:
"[The 'public or general interest' test set forth in *Rosenbloom*] would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not—to determine, in the words of Mr. Justice Marshall, 'what information is relevant to self-government.' *Rosenbloom v. Metromedia, Inc.*, 403 U.S. at 79. We doubt the wisdom of committing this task to the conscience of judges." 418 U.S. at 346.

[2] After *Gertz* the Supreme Court has focused on the plaintiff's actions, not the substantive nature of the controversy. In *Time, Inc. v. Firestone*, 424 U.S. 448, 456 (1976), for instance, Justice Rehnquist said:
"It was our recognition and rejection of this weakness in the *Rosenbloom* test which led us in *Gertz* to eschew a subject-matter test for one focusing upon the character of the defamation plaintiff."
More recently in *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 167 (1979), Justice Rehnquist said:
"We emphasized [in *Gertz*] that a court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' "
In *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979), Chief Justice Burger, quoting from *Time, Inc. v. Firestone, supra*, at 456, said:
"The 'use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.' "
Several United States Circuit Courts of Appeals have recognized in recent cases that the determination of a person's status as a "public figure" must focus upon that person's actions rather than the underlying controversy. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980); *Brewer v. Memphis Pub. Co., Inc.*, 626 F.2d 1238, 1254 (5th Cir. 1980); *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 584 (8th Cir. 1980).

whether a particular controversy is a public controversy and indicate that the primary focus in determining whether the plaintiff is a public figure should be on whether the plaintiff voluntarily thrust himself or herself into the controversy. Nevertheless, the majority errs both in relying too heavily on an analysis of the substantive nature of the controversy and then in concluding that the controversy is not of public interest or concern. The majority also errs with respect to the second element of public figure status, that is, whether the plaintiff voluntarily thrust himself into the vortex of a controversy.

The majority concludes that there was no public controversy, because "the Koehring stockholder disputes did not have an impact outside of those immediately interested in the Koehring corporation." *Supra,* p. 650. The majority unfortunately never explains who it thinks are those "immediately interested in the Koehring corporation." If the phrase "immediately interested in the Koehring corporation" refers to the shareholders, the majority is talking about a dispute that has an impact on approximately 11,500 people. If the phrase "immediately interested in the Koehring corporation" refers to suppliers to and customers, competitors and employees of the corporation, and people living in communities in which plants are located (and I think all these persons can be considered as "immediately interested in the Koehring corporation"), the majority is talking about a dispute that has an impact on many thousands of people. Koehring, a *Fortune* 500, publicly owned, publicly traded, international corporation with headquarters in Milwaukee, Wisconsin, employs between 10,000 and 11,000 persons at 23 plants in the United States, Canada, Germany, France, England and Japan and has sales offices in other countries. On how many thousands must the

controversy have an impact in order for the majority to consider the matter a public controversy?

Public policy favors the publication of information about publicly held business entities. Federal and state securities laws are based on the theory that disclosure protects the integrity of the marketplace. And the marketplace affects all of us. Our country is committed to the protection of free enterprise; great economic and social power thus rests in private hands, and private economic interests and corporate entities vitally affect the lives of all of us. Citizens have a legitimate and substantial interest in the conduct of business in this country, and the guarantee of free speech and free press includes uninhibited debate about the operations of publicly held business entities. The first amendment is not limited to the issues of politics or government. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama,* 310 U.S. 88, 102 (1940).

Instead of analyzing the substantive nature of the controversy, the majority should have asked whether the Koehring controversy was an existing publicly debated dispute into which Denny had voluntarily thrust himself before the alleged defamation occurred. It was. Before the news story in issue, Denny had sought media coverage and governmental agency attention and cooperated fully when the media sought him. For about a year before the allegedly defamatory story appeared, numerous articles appeared in the *Milwaukee Journal, Milwaukee Sentinel,* and *The Wall Street Journal* concerning the Koehring controversy, and the Dow Jones wire service carried word of the controversy. Hence this case, unlike *Hutchinson v. Proxmire,* is not one in which the defendants created their own defense by thrusting the plaintiff into a public debate. It was not

the *Business Week* story that made Denny part of the dispute.

Although the majority concedes that Denny deliberately thrust himself into the forefront of the dispute to influence the resolution of the issue and also deliberately sought media coverage, the majority concludes that Denny is not a public figure because by the time Denny talked to Santry, Mertz had resigned and Denny was no longer attempting to influence a public controversy. It is obvious that even if the controversy had ended a few weeks before the story, and I am not conceding that it had, Denny had not ceased to be a public figure in regard to the Koehring controversy in the short span of a few weeks.

The majority makes the factual determination that Denny did not have media access and then concludes that because he had no access to the media he was not a public figure. The majority misreads *Gertz*. In *Gertz* the court did not say the person had to have media access to be a public figure. The court merely said in *Gertz* that public figures "usually enjoy significantly greater access" to media than private individuals and therefore the court was justified in adopting a general rule giving public figures less protection against defamation than "private persons." *Gertz*, 418 U.S. at 344. Only rarely does a public officer or public figure have such prominence as to command the type of media attention which will provide a meaningful chance to rebut defamatory falsehood and defend against it.

The majority also reasons that Denny is not a public figure because he was motivated by his private monetary interest and not by a general concern for corporate governance. The majority does not explain why Denny's motivation for thrusting himself into the fray is relevant to the issue of whether he is a public figure.

Because Denny thrust himself to the forefront of a public controversy to influence the resolution of the dispute, thereby inviting media attention and comment, I

would hold that Denny is a public figure and must prove actual malice in his suit against both media and non-media defendants. Because it is clear that the plaintiff will be unable to prove actual malice at trial by clear and convincing evidence, I would affirm the judgment of the circuit court granting summary judgment for the defendants.

*Standard of Proof in the Defamation of a Private Person by a Media Defendant.* The majority viewing Denny as a private person adopts the "negligence standard," rather than the actual malice standard, in Denny's suit against the media defendant. The due care standard may arguably represent a fair balance of society's interest in protecting free speech and free press and society's interest in protecting private persons from injury to reputation. I therefore could be persuaded to accept the application of the negligence standard to cases involving an alleged defamation by the media of a truly "private person," if the majority did not so narrowly construe "public figure."

The reason that *New York Times v. Sullivan* and *Curtis Publishing v. Butts,* 338 U.S. 130 (1967), require proof of actual malice in cases involving defamation of public officers and public figures is to ensure effective communication. The Supreme Court explained:

> "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open . . . .
> "The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.' " *New York Times v. Sullivan,* 376 U.S. at 270, quoting *United States v. Associated Press,* 52 F. Supp. 362, 372 (S.D. N.Y. 1943).

A too narrow reading of "public figure" deters media debate on public issues and contravenes the federal first amendment constitutional protection.

I believe the majority has in this case so narrowly interpreted the concept of public figure that its adoption of the standard of negligence for suits by private persons is not defensible. I could accept the adoption of the negligence standard only if the court fairly and reasonably interprets the concept of public figure in keeping with the purposes of the first amendment.

*The Nature of the Defendant—Media; Non-Media.* The United States Supreme Court has said that it has never decided the question "whether the *New York Times* standard can apply to an individual defendant rather than to a media defendant." *Hutchinson v. Proxmire,* 443 U.S. 111, 133, n. 16 (1979).[3]

The majority in the case at bar undertakes the task of determining the extent to which the first amendment and the Wisconsin constitution are applicable to defamation actions against non-media persons. The majority implicitly makes a prediction that the United States Supreme Court will not extend *New York Times* and its progeny to defamatory expression by non-media persons and in the process concludes that the state constitution shall be interpreted in the same manner as the federal constitution. Thus the majority holds that the common law rules of defamation apply to non-media defendants. While this case is one in which, according to the majority, a non-media defendant (Mertz) has allegedly defamed a private person, it is unclear from the language and reasoning of the majority opinion whether the ma-

[3] Several commentators have pointed out that in the *New York Times* case the Supreme Court held that individual non-media defendants as well as the media defendants were protected by the constitutional "actual malice rule" where a public officer was involved. *See also Garrison v. Louisiana,* 379 U.S. 64 (1964); *Henry v. Collins,* 380 U.S. 356 (1965); *St. Amant v. Thompson,* 390 U.S. 727 (1968). Apparently the United States Supreme Court has not decided any cases in which a public figure or a private person sought damages from a non-media defendant.

jority is adopting the common law of defamation for all non-media defendants, irrespective of the nature of the plaintiff (public officer, public figure or private person), or is restricting the adoption of the common law of defamation to cases of a private person suing a non-media defendant.

I do not think we need engage in speculation as to what the United States Supreme Court will say about this issue under the federal constitution. Regardless of federal first amendment requirements, the majority has reached the incorrect result. The better approach, I believe, is that adopted by the American Law Institute in the Restatement of Torts (Second), namely that the same rules of defamation are applicable to the case whether the defendant is media or non-media. I reach this result for several reasons:

(1) The majority's conclusion contravenes the state constitutional guarantee of Art. I, sec. 3 of the Wisconsin Constitution[4] which differs from the first amendment[5] in that the Wisconsin Constitution affirmatively guarantees each person the right to speak, write and publish "freely" while "being responsible for the abuse of that right." There is nothing in the state constitution to lead me to conclude that the framers intended the words "freely" and "abuse of that right" to have different

---

[4] Art. I, sec. 3 of the Wisconsin Constitution provides:

"Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact."

[5] The first amendment, U.S. Const., provides:

"Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."

meanings for media and non-media persons. Why should a non-media defendant who defames a person have any less constitutional protection than a media defendant who defames the same person? Does the majority intend a non-media defendant to be subject to greater damages on less proof than is a media defendant? As the American Law Institute explains in the Restatement of Torts (Second), sec. 580B, Comment *e*, pp. 225–26 (1976):

". . . the protection of the First Amendment extends to freedom of speech as well as to freedom of the press, and the interests that must be balanced to obtain a proper accommodation are similar. It would seem strange to hold that the press, composed of professionals and causing much greater damage because of the wider distribution of the communication, can constitutionally be held liable only for negligence, but that a private person, engaged in a casual private conversation with a single person, can be held liable at his peril if the statement turns out to be false, without any regard to his lack of fault."

The state constitution protects the right of all persons to speak, write and publish, and this court should be reluctant, without setting forth sufficient reason, to read the state constitution to create a privileged industry.[6]

(2) The majority's classification of media and non-media defendants does not withstand the defendant's challenge that the classification violates the equal protection guarantee of the state constitution.

---

[6] *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 781–83 (1978):
"The press cases emphasize the special and constitutionally recognized role of the institution in informing and educating the public, offering criticism, and providing a forum for discussion and debate . . . . But the press does not have a monopoly on either the First Amendment or the ability to enlighten . . . . Even decisions seemingly based on the individual's right to express himself acknowledge that the expression may contribute to society's edification."

(3) Regardless of state constitutional strictures, as a practical matter defamation law should apply equally to media and non-media defendants alike. Distinguishing between media and non-media raises the difficult question of identifying which defendants are media defendants and which are not. Are the publishers of handbills, labor union newspapers, local labor union newsletters, or neighborhood association newsletters media or non-media?

Even if defendant Mertz is not a media person, his communication to Santry was not a "private" casual communication between two "private" people talking to each other. The majority portrays Mertz-Santry as a purely private communication. It was not. Mr. Mertz was not talking to Mr. Santry across the back fence about matters of personal interest. Ex-corporate officer Mertz was talking to a reporter who was interested in writing a story about Mertz and the controversy at Koehring.

(4) The common law of defamation, apart from the relatively recent injection of constitutional considerations, is renowned for its complexity. If we apply the same rules of defamation to media and non-media defendants, we can decrease, or at least not add to, the complexity of the law, and we can move toward consistency and simplicity in the law of defamation. *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688, 696 (1976).

(5) The general rule is that the tort of defamation is a strict liability tort. In many instances, however, the application of the doctrines of "conditional privilege" and "abuse of privilege" means that the law of defamation in operation is not a strict liability tort but is a tort based on negligence. Thus the majority's retention of the common law rules of defamation, along with the numerous privileges and their abuse, may result, in many cases, in the parties and the court unnecessarily taking a cumber-

some route to the application of a negligence standard. In the case at bar, for example, the majority refuses to apply the negligence standard but the conditional privilege appears to impose a "reasonable person" standard on Mertz. *Supra,* pp. 663, 664. See Restatement (Second) of *Torts* sec. 580B, comment *e,* pp. 230–31, sec. 592A, Special Note, pp. 259–260 (1977); Frakt, *The Evolving Law of Defamation: New York Times Co. v. Sullivan to Getz v. Robert Welch, Inc. and Beyond,* 6 Rutgers-Camden L. J. 471, 511 (1975).

For the reasons set forth above, I would reverse the decision of the court of appeals and affirm the judgment of the circuit court.

